JOSEPH R. DORSEY et al., Suing on Behalf of Themselves and All Others Similarly Situated, Appellants, *v.* STUYVESANT TOWN CORPORATION et al., Respondents.

SHAD POLIER, as a Taxpayer of the City of New York, Appellant, *v.* WILLIAM O'DWYER, as Mayor of the City of New York, et al., Respondents.

Argued April 11, 1949; decided July 19, 1949.

*Charles Abrams, Thurgood Marshall, Joseph B. Robison, Will Maslow* and *Shad Polier,* in person, for Joseph R. Dorsey and others, appellants. I. Discrimination against Negroes in Stuyvesant Town violates rights protected by the Constitutions of the United States and the State of New York. The United States and New York Constitutions forbid State action which discriminatorily denies equal opportunity to housing on the ground of race. (*Strauder* v. *West Virginia,* 100 U. S. 303; *Hirabayashi* v. *United States,* 320 U. S. 81; *Hurd* v. *Hodge,* 334 U. S. 24; *Buchanan* v. *Warley,* 245 U. S. 60; *Ex Parte Virginia,* 100 U. S. 339.) II. Discrimination by private agencies is constitutionally forbidden when it is supported, participated in,

effectuated, or made possible by State action. (*Shelley* v. *Kraemer*, 334 U. S. 1; *Smith* v. *Allwright*, 321 U. S. 649; *Rice* v. *Elmore*, 165 F. 2d 387, 333 U. S. 875; *Steele* v. *Louisville & Nashville R. R. Co.*, 323 U. S. 192; *Marsh* v. *Alabama*, 326 U. S. 501; *Watchtower Bible & Tract Soc.* v. *Metropolitan Life Ins. Co.*, 297 N. Y. 339; *Kerr* v. *Enoch Pratt Free Lib.*, 149 F. 2d 212; *Connecticut Coll. for Women* v. *Calvert*, 87 Conn. 421; *Matter of Murray* v. *La Guardia*, 291 N. Y. 320.) III. The Redevelopment Companies Law must be administered without racial discrimination. (*Matter of N. Y. City Housing Authority* v. *Muller*, 270 N. Y. 333; *Matter of Deansville Cemetery Assn.*, 66 N. Y. 569; *Connecticut Coll. for Women* v. *Calvert*, 87 Conn. 421; *University of So. California* v. *Robbins*, 37 P. 2d 163; *Nixon* v. *Condon*, 286 U. S. 73; *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288; *National Labor Relations Bd.* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1; *Anniston Mfg. Co.* v. *Davis*, 301 U. S. 337; *Screws* v. *United States*, 325 U. S. 91.) IV. The contract between Stuyvesant Town and New York City must be performed without racial discrimination. (*Shelley* v. *Kraemer*, 334 U. S. 1.) V. Under section 51 of the General Municipal Law, a taxpayer's action may be brought to restrain the unconstitutional administration of the Stuyvesant Town contract here alleged. (*Holton* v. *Board of Supervisors*, 245 App. Div. 144; *Hicks* v. *Eggleston*, 105 App. Div. 73; *Altschul* v. *Ludwig*, 216 N. Y. 459; *Schieffelin* v. *Komfort*, 212 N. Y. 520; *Brill* v. *Miller*, 140 App. Div. 602; *Bareham* v. *City of Rochester*, 221 App. Div. 36; *Blanshard* v. *City of New York*, 141 Misc. 609; *Hathaway* v. *City of Oneonta*, 148 Misc. 695.)

*John P. Walsh* for Friendship House of Harlem, *amicus curiæ*, in support of appellants' position. I. The civil authority is bound by moral law. It may not co-operate in nor lend itself to moral wrong or injustice against any group subject to it. (*Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis*, 165 U. S. 150; *Benson* v. *Mayor, Aldermen & Commonalty of City of N. Y.*, 10 Barb. 223; *Booten* v. *Pinson*, 77 W. Va. 412; *Fletcher* v. *Peck*, 6 Cranch [U. S.] 87; *Holden* v. *Hardy*, 169 U. S. 366; *Hebert* v. *Louisiana*, 272 U. S. 312.) II. The practice of refusing accommodation in Stuyvesant Town to Negroes, solely because they

are Negroes, is a moral wrong and injustice against plaintiffs and a large class of persons subject to the civil authority of the State and City of New York. (*Pratt* v. *La Guardia,* 182 Misc. 462; *Shelley* v. *Kraemer,* 334 U. S. 1; *Buchanan* v. *Warley,* 245 U. S. 60; *Hirabayashi* v. *United States,* 320 U. S. 81.) III. The civil authority (the State and City of New York) co-operates in the moral wrong and injustice of Stuyvesant's discrimination. (*Matter of Murray* v. *La Guardia,* 291 N. Y. 320; *Catlette* v. *United States,* 132 F. 2d 902.) IV. The court should enjoin either the discrimination complained of or the continued co-operation of the civil authority in the project discriminating. (*Kenyon* v. *City of Chicopee,* 320 Mass. 528; *Orloff* v. *Los Angeles Turf Club,* 30 Cal. 2d 110; *Crampton* v. *Zabriskie,* 101 U. S. 601; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis,* 165 U. S. 150; *Holden* v. *Hardy,* 169 U. S. 366.)

*Carl Rachlin* and *Lester C. Migdal* for Citizens Housing and Planning Council, *amicus curiæ,* in support of appellant's position. I. Stuyvesant Town Corp. is a corporation created to perform a public function and obtains public benefits under the Redevelopment Companies Law, and as such may not discriminate in the selection of tenants in violation of the Constitutions of the United States and the State of New York. (*Smith* v. *Allwright,* 321 U. S. 649; *Rice* v. *Elmore,* 165 F. 2d 387, 333 U. S. 875; *Marsh* v. *Alabama,* 326 U. S. 501.) II. By discriminating against Negroes in the selection of tenants, defendant corporations employ the power of the State of New York and substantial public benefits in violation of the Constitutions of the United States and the State of New York. (*Shelley* v. *Kraemer,* 334 U. S. 1; *Connecticut Coll. for Women* v. *Calvert,* 87 Conn. 421; *University of So. California* v. *Robbins,* 37 P. 2d 163.) III. The City of New York should be enjoined from giving tax benefits in support of discrimination against Negroes irrespective of whether the corporations are considered public or private corporations.

*Paul L. Ross* for Town and Village Tenants Committee to End Discrimination in Stuyvesant Town, *amicus curiæ,* in support of appellants' position. Racial and residential segregation

in Stuyvesant Town deprives the present and future tenants of Stuyvesant Town of the right to live under conditions of American democracy as defined by State, Federal and local laws. (*Allgeyer* v. *Louisiana*, 165 U. S. 578; *Hurd* v. *Hodge*, 334 U. S. 24; *Shelley* v. *Kraemer*, 334 U. S. 1.)

*Andrew D. Weinberger* for the Board of Home Missions of the Congregational and Christian Churches and others, *amici curiæ*, in support of appellants' position. I. The right to lease and occupy a home is a civil right and as such the discrimination of respondents is within the prohibitions of section 11 of article I of the State Constitution. (*Allgeyer* v. *Louisiana*, 165 U. S. 578; *Hurd* v. *Hodge*, 334 U. S. 24; *Strauder* v. *West Virginia*, 100 U. S. 303; *Shelley* v. *Kraemer*, 334 U. S. 1; *Kemp* v. *Rubin*, 298 N. Y. 590.) II. The civil right to occupy a home is protected by the State Constitution. (*Civil Rights Cases*, 109 U. S. 3; *Buchanan* v. *Warley*, 245 U. S. 60; *Marsh* v. *Alabama*, 326 U. S. 501.) III. Racial residential segregation is repugnant to the public policy of the State of New York. (*Pittsburgh, C., C. & St. L. Ry. Co.* v. *Kinney*, 95 Ohio St. 64; *James* v. *Marinship Corp.*, 25 Cal. 2d 721; *Georgia Fruit Growers Exch.* v. *Turnipseed*, 9 Ala. App. 123; *Camp-of-the-Pines* v. *New York Times Co.*, 184 Misc. 389.) IV. Residential segregation has created a pattern of unprecedented overcrowding and congestion in the housing of Negroes in New York and an appalling deterioration of their dwelling conditions. The extension and aggravation of slum conditions have in turn resulted in a serious rise in disease, crime, vice and racial tension.

*Paul O'Dwyer* and *Lester M. Levin* for New York Chapter of the National Lawyers Guild, *amicus curiæ*, in support of appellants' position. I. The power entrusted to Stuyvesant by the State and City of New York is a manifestation of governmental action, and subject to its limitations. (*Nixon* v. *Condon*, 286 U. S. 73; *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337; *Buchanan* v. *Warley*, 245 U. S. 60; *Smith* v. *Allwright*, 321 U. S. 649; *Virginia* v. *Rives*, 100 U. S. 313.) II. Section 11 of article I of the State Constitution makes it mandatory that defendants Stuyvesant and Metropolitan be enjoined from their discriminatory action. (*Steele* v. *Louisville & Nashville R. R. Co.*, 323 U. S. 192.)

*Samuel Seabury, C. Frank Reavis, Jeremiah M. Evarts, George Trosk, Joseph C. Simpson* and *Churchill Rodgers* for

Stuyvesant Town Corporation and another, respondents. I. The restraints of the equal protection clauses of the Fourteenth Amendment and of the State Constitution are directed at the exercise of governmental power. Stuyvesant's rental policy is not subject to these restraints since Stuyvesant possesses no governmental powers, is privately owned and operated, and is engaged in constructing and operating a private project. The equal protection clauses of the Fourteenth Amendment and of the New York Constitution impose restraints upon the exercise of governmental power — not upon the exercise of private rights. (*Shelley* v. *Kraemer,* 334 U. S. 1; *Ex Parte Virginia,* 100 U. S. 339; *Buchanan* v. *Warley,* 245 U. S. 60; *Nixon* v. *Condon,* 286 U. S. 73; *Smith* v. *Allwright,* 321 U. S. 649; *Steele* v. *Louisville & Nashville R. R. Co.,* 323 U. S. 192; *Kerr* v. *Enoch Pratt Free Lib.,* 149 F. 2d 212; *Connecticut Coll. for Women* v. *Calvert,* 87 Conn. 421; *Alsberg* v. *Lucerne Hotel Co.,* 46 Misc. 617; *Pratt* v. *La Guardia,* 182 Misc. 462.) II. The fact that the city granted partial tax exemption does not subject Stuyvesant to the restraints of the Fourteenth Amendment. (*Piqua Branch of State Bank of Ohio* v. *Knoop,* 16 How. [U. S.] 369; *People ex rel. 1170 5th Ave. Corp.* v. *Goldfogle,* 254 N. Y. 476; *Hermitage Co.* v. *Goldfogle,* 204 App. Div. 710, 236 N. Y. 554; *Everson* v. *Board of Education,* 330 U. S. 1; *Norris* v. *Mayor & City Council of Baltimore,* 78 F. Supp. 451.) III. The fact that the city exercised its power of condemnation does not subject Stuyvesant to the restraints of the Fourteenth Amendment. (*Matter of Murray* v. *La Guardia,* 291 N. Y. 320.) IV. The fact that the city exercised its power to close streets and exchange property does not subject Stuyvesant to the restraints of the Fourteenth Amendment. (*Watchtower Bible & Tract Soc.* v. *Metropolitan Life Ins. Co.,* 297 N. Y. 339.) V. The fact that the statute contains standards and rules to be observed by a redevelopment company does not subject Stuyvesant to the restraints of the Fourteenth Amendment. (*Kerr* v. *Enoch Pratt Free Lib.,* 149 F. 2d 212; *Norris* v. *Mayor & City Council of Baltimore,* 78 F. Supp. 451; *Madden* v. *Queens Co. Jockey Club,* 296 N. Y. 249; *Woollcott* v. *Shubert,* 217 N. Y. 212; *Buckstaff Bath House Co.* v. *McKinley,* 308 U. S. 358.) VI. The city had power to enter into this bargain without subjecting Stuyvesant to the

restraints of a public agency. (*Hermitage Co.* v. *Goldfogle*, 204 App. Div. 710; *Piqua Branch of State Bank of Ohio* v. *Knoop*, 16 How. [U. S.] 369; *United States* v. *Baltimore & Ohio R. R. Co.*, 17 Wall. [U. S.] 322; *Everson* v. *Board of Education*, 330 U. S. 1.)

*John P. McGrath, Corporation Counsel* (*William S. Lebwohl, Seymour B. Quel* and *Phillip V. Sherman* of counsel), for City of New York, respondent. I. Stuyvesant, the private capital owning and managing its housing project, has the power by its private action to fix its own policies with respect to selection of its tenants without any governmental act, consent or approval. Under the cases the Fourteenth Amendment of the Federal Constitution and article I of the State Constitution are not applicable to such private action. (*Matter of N. Y. City Housing Authority* v. *Muller*, 270 N. Y. 333; *Matter of Murray* v. *La Guardia*, 291 N. Y. 320; *Hermitage Co.* v. *Goldfogle*, 204 App. Div. 710, 236 N. Y. 554; *Pratt* v. *La Guardia*, 182 Misc. 462, 268 App. Div. 973.) II. Under the cases the Fourteenth Amendment of the United States Constitution and article I of the State Constitution do not apply to the private action of these private owners. (*Shelley* v. *Kraemer*, 334 U. S. 1.) III. Appellant Polier, as a taxpayer, cannot maintain this suit. (*McCabe* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 235 U. S. 151; *Mitchell* v. *United States*, 313 U. S. 80; *Turpin* v. *Lemon*, 187 U. S. 51; *Hooker* v. *Burr*, 194 U. S. 415.)

BROMLEY, J. This appeal, involving two actions upon a consolidated record, raises the important question of whether a corporation organized under the Redevelopment Companies Law has the privilege, admittedly possessed by an ordinary private landlord, to exclude Negroes from consideration as tenants. Appellants deny that respondents Stuyvesant Town Corporation and Metropolitan Life Insurance Company have such a privilege. They contend that these respondents are subject to the restraints of the equal protection clauses of the State and Federal Constitutions and that in their selection of tenants they cannot lawfully discriminate against Negroes, a policy which has been adhered to in renting apartments in the Stuyvesant Town development in New York City. Since the constitutional provisions referred to impose restraints on State action only, and not on

private action, the precise question to be decided is whether Stuyvesant and Metropolitan in the circumstances of this appeal are subject to the constitutional limitations applicable to State action.

The two actions involved in this appeal were brought simultaneously. In the Dorsey suit, plaintiffs are Negro veterans who have applied for apartments. In the Polier suit, plaintiff is a taxpayer. In both actions plaintiffs seek to enjoin Stuyvesant and Metropolitan from denying any of their accommodations and facilities in Stuyvesant Town to any person because of that person's race or color. In the Polier action, plaintiff seeks, in addition, to enjoin the City of New York from granting tax exemption to, and further performing a contract with, Stuyvesant and Metropolitan unless they cease discriminating against Negroes. Defendants' motions for judgment on the pleadings were granted below and judgments of dismissal unanimously affirmed by the Appellate Division, First Department. Since appellant Polier's status as a taxpayer does not support an action to challenge as unconstitutional the acts of respondent companies and officials (*Bull* v. *Stichman*, 273 App. Div. 311, affd. 298 N. Y. 516), his appeal does not present the constitutional question essential to our jurisdiction (Civ. Prac. Act, § 588, subd. 1, cl. [a]) and must be dismissed. Subsequent references to appellants will indicate plaintiffs in the Dorsey suit, and to respondents will indicate Stuyvesant and Metropolitan.

Stuyvesant Town was built pursuant to a contract between the City of New York, Metropolitan and its wholly owned subsidiary Stuyvesant. The latter was organized by the former in 1943 as a redevelopment company under the Redevelopment Companies Law. Stuyvesant is a private corporation, all of its stock and debentures being owned and all of its working capital having been provided by Metropolitan. The entire cost of acquisition of the land in the project area and of the construction project has been advanced by Metropolitan. It represents an investment of not less than $90,000,000 of private funds held by Metropolitan for the benefit of its more than thirty-three million policyholders.

The project has been constructed in accordance with a plan approved by the city planning commission and the board of estimate of the City of New York, and the contract above

referred to was approved by the State Superintendent of Insurance and the board of estimate, pursuant to the requirements of section 15 of the Redevelopment Companies Law.

The problems posed by this appeal require an understanding of the constitutional and statutory provisions applicable to housing in the State of New York. For that reason we proceed to set them forth in some detail. In 1938, the housing article of the State Constitution was adopted by the Constitutional Convention and approved by vote of the People. It is article XVIII, and in section 1 thereof it is provided that: " Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto." The two purposes are distinct and different, and Stuyvesant Town involves the clearance and rehabilitation of a substandard and insanitary area and not low rent housing for persons of low income (*Matter of Murray* v. *La Guardia,* 291 N. Y. 320, 331–332). It may fairly be said that the whole housing article is instinct with the theory, consistent with its two purposes, that low rent housing for persons of low income is to be a function of government and the rehabilitation of substandard areas is to be the function of private enterprise aided by government. Section 2 provides that: " For and in aid of such purposes  *  *  *  the legislature may: make or contract to make or authorize to be made or contracted capital or periodic subsidies by the state to any city, town, village, or public corporation, payable only with moneys appropriated therefor from the general fund of the state; authorize any city, town or village to make or contract to make such subsidies to any public corporation, payable only with moneys locally appropriated therefor from the general or other fund available for current expenses of such municipality; authorize the contracting of indebtedness for the purpose of providing moneys out of which it may make or contract to make or authorize to be made or contracted loans by the state to any city, town, village or public corporation; authorize any city, town or village to make or contract to make loans to any public corporation;

authorize any city, town or village to guarantee the principal of and interest on, or only the interest on, indebtedness contracted by a public corporation; authorize and provide for loans by the state and authorize loans by any city, town or village to or in aid of corporations regulated by law as to rents, profits, dividends and disposition of their property or franchises and engaged in providing housing facilities; authorize any city, town or village to make loans to the owners of existing multiple dwellings for the rehabilitation and improvement thereof for occupancy by persons of low income as defined by law; grant or authorize tax exemptions in whole or in part, except that no such exemption may be granted or authorized for a period of more than sixty years; authorize cooperation with and the acceptance of aid from the United States; grant the power of eminent domain to any city, town or village, to any public corporation and to any corporation regulated by law as to rents, profits, dividends and disposition of its property or franchises and engaged in providing housing facilities.

" As used in this article, the term ' public corporation ' shall mean any corporate governmental agency (except a county or municipal corporation) organized pursuant to law to accomplish any or all of the purposes specified in this article."

It will be noted that in specifying the powers of the Legislature, section 2 of article XVIII makes a distinction between a public corporation — which is defined to mean any corporate governmental agency organized for any of the specified purposes — and a corporation regulated by law as to rents, profits, dividends and disposition of its property or franchises and engaged in providing housing facilities. For instance, the Legislature is empowered to make State subsidies to public corporations, but only loans to corporations regulated as above described, and to authorize municipalities to guarantee principal and interest of obligations incurred by public corporations but not other corporations. Stuyvesant is not a public corporation but is a corporation regulated by law. Sections 3 to 7, inclusive, make provision for the creation of State debt for capital and periodic subsidies, impose certain limitations thereon, set up restrictions on the powers of cities, towns and villages to contract indebtedness in aid of the above-mentioned two purposes, impose liability on cities, towns and villages for State loans made to certain

public corporations, empower the Legislature to make loans or subsidies on conditions consistent with the purposes of the article, such as restricting occupancy to persons of low income and according preference in occupancy to those who live or have lived in the area of the project, and prescribe the method of computing the liability for guaranties of the indebtedness of public corporations. Sections 8 and 9 provide for the taking and condemnation of property in excess of that actually and immediately required for the project if needed to effectuate the purposes of the article. There is nothing in the Constitution or, as will be demonstrated hereinafter, in the statute exercising the power granted by the Constitution indicating that the State is to have any part in the operation of dwellings resulting from the rehabilitation of substandard areas. Indeed section 10 provides that: " * * * nothing in this article contained shall be deemed to authorize or empower the state, or any city, town, village or public corporation, to engage in any private business or enterprise other than the building and operation of low rent dwelling houses for persons of low income as defined by law, or the loaning of money to owners of existing multiple dwellings as herein provided."

Thereafter the Legislature enacted the Redevelopment Companies Law (L. 1942, ch. 845, as amd. by L. 1943, ch. 234 and L. 1947, ch. 840; McKinney's Unconsol. Laws, §§ 3401-3426). In approving the amendment the Governor stated, in part: " The law permits and encourages the entrance into the housing field of life insurance companies. Since the enactment of the original law, there have been no projects. The amendments made by this bill are designed to attract private investment funds into the housing field."

Section 2 of the Redevelopment Companies Law provides as follows: " * * * It is hereby declared that in certain areas of municipalities located within this state there exist substandard conditions and insanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters; that there is not in such areas a sufficient supply of adequate, safe and sanitary dwelling accommodations properly planned and related to public facilities; that modern stand-

ards of urban life require that housing be related to adequate and convenient public facilities; that the aforesaid substandard and insanitary conditions depress and destroy the economic value of large areas and by impairing the value of private investments threaten the sources of public revenues; that the public interest requires the clearance, replanning, reconstruction and neighborhood rehabilitation of such substandard and insanitary areas, together with adequate provision for recreational and other facilities incidental and appurtenant thereto according to the requirements of modern urban life and that such clearance, replanning, reconstruction and neighborhood rehabilitation are essential to the protection of the financial stability of such municipalities; that in order to protect the sources of public revenue it is necessary to modernize the physical plan and conditions of urban life; that these conditions cannot be remedied by the ordinary operations of private enterprise; that provision must be made to encourage the investment of funds in corporations engaged in providing redevelopment facilities to be constructed according to the requirements of city planning and in effectuation of official city plans and regulated by law as to profits, dividends and disposition of their property or franchises; that provision must be made to enable insurance companies to provide such facilities, subject to regulation by law as to the return from such facilities and the disposition of property acquired for such purpose; and that provision must also be made for the acquisition for such corporations and companies at fair prices of real property required for such purposes in substandard areas and for public assistance of such corporations and companies by the granting of partial tax exemption; that the cooperation of the state and its subdivisions is necessary to accomplish such purposes; that the clearance, replanning and reconstruction, rehabilitation and modernization of substandard and insanitary areas and the provision of adequate, safe, sanitary and properly planned housing accommodations in effectuation of official city plans by such corporations and companies in these areas are public uses and purposes for which private property may be acquired for such corporations and companies and partial tax exemption granted; that these conditions require the creation of the agencies, instrumentalities and corporations hereinafter prescribed for the purpose of attaining the ends herein recited;

and the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination.''

Section 4 provides that a redevelopment company may be created by three or more persons filing a certificate which, among other specified information, shall contain:

'' 13. A declaration that the redevelopment company has been organized to serve a public purpose and that it shall be and remain subject to the supervision and control of the supervising agency except as provided in this act, so long as this act remains applicable to any project of the redevelopment company; that all real and personal property acquired by it and all structures erected by it, shall be deemed to be acquired or created for the promotion of the purposes of this act.

'' 14. A declaration that, after providing for all expenses, taxes and assessments, there shall be paid annually out of the earnings of the redevelopment company for interest, amortization, depreciation and dividends, a sum equal to but not exceeding six per centum of the total actual final cost of the project as defined by subdivision two of section thirteen of this act ''.

Sections 6 and 7 provide that the provisions of the Business Corporations Law, General Corporation Law and Stock Corporation Law shall apply to redevelopment corporations, except where such provisions are in conflict with the provisions of the Redevelopment Companies Law, and that each such corporation shall have and may exercise such of the powers conferred by the General Corporation Law as shall be necessary in conducting its business and consistent with the provisions of the Redevelopment Companies Law. Limitations are imposed upon redevelopment companies in connection with various aspects of their businesses. Section 8 provides for a limited return on investment by stipulating that there shall be paid annually out of the earnings of the redevelopment company, after providing for all expenses, taxes and assessments a sum for interest, amortization, depreciation and dividends, equal to but not exceeding 6% of the total actual final cost of the project, which obligation shall be cumulative. Any cash surplus in excess of the amount so provided shall, upon dissolution of the company, be paid into the general fund of the municipality. Section 13 provides that a redevelopment company shall not have power to acquire any

realty for a project unless the supervising agency and the local legislative body determine that such acquisition is necessary or convenient for the public purpose defined in the act. It also provides that no such company shall issue stock, debentures and bonds in an amount greater than the total actual final cost of the project and that no contract shall be made for the payment of salaries to officers or employees, or for the construction, substantial repair, improvement or operation of projects except subject to the approval of the supervising agency. The supervising agency referred to means only the Superintendent of Insurance where, as here, an insurance company owns the stock and debentures of a redevelopment company, and if, as here, a contract is entered into the parties to which are a municipality, a redevelopment company and an insurance company, the supervising agency shall have no continuing power of supervision once it shall have approved the contract (§§ 3, 15). This means that the general power of visitation, examination and control provided for by section 21 is inapplicable to Stuyvesant. There are other limitations upon methods of financing, mortgage, sale or disposition of property and alteration of structures (§§ 9, 10, 11, 12, 14, 16, 23).

Section 15 sets up a procedure for the submission and approval of a plan of a proposed project which requires the prior approval of the supervising agency and the local planning commission. Thereafter a contract shall be proposed which, prior to its execution, must be approved by the local legislative body. It is provided that the contract shall regulate the rents to be charged and may contain other provisions for the financing, construction, operation and supervision of the project.

The statute provides that a municipality may take property by condemnation for a redevelopment company provided the latter shall pay all sums expended in connection with such acquisition, and it authorizes the municipality to convey such land to the company (§ 20). It also authorizes any local legislative body to convey to such company land in any street which is duly closed or discontinued pursuant to the plan, upon payment therefor or upon exchange for other lands (§ 20).

Section 24 provides that after the termination of tax exemption, in any manner, a redevelopment company may dissolve and

convey its property to whomsoever it desires, and all limitations of the act shall cease.

Finally, section 26 provides as follows:

" The local legislative body of any municipality in which a project of such company is or is to be located may by contract agree with any redevelopment company to exempt from local and municipal taxes, other than assessments for local improvements, all or part of the value of the property included in such project which represents an increase over the assessed valuation of the real property, both land and improvements, acquired for the project at the time of its acquisition by the redevelopment company which originally undertook the project and for such definite period of years as such contract may provide. The tax exemption shall not operate for a period of more than twenty-five years, commencing in each instance from the date on which the benefits of such exemption first become available and effective.

" A redevelopment company which has been granted and has received tax exemption pursuant to this section may at any time elect to pay to the municipality the total of all accrued taxes for which exemption was granted and received, together with interest at the rate of five per centum per annum. Upon such payment the tax exemption of the project shall thereupon cease and terminate."

The Legislature deliberately and intentionally refrained from imposing any restriction upon a redevelopment company in its choice of tenants. The law contains none. Attempts, repeatedly made in the Legislature since the law was enacted, to alter the policy of the statute in this respect have failed. (See, e.g., 1948 Sess., Assem. Int. 127, Pr. No. 127; Assem. Int. 217, Pr. No. 217; Assem. Int. 1270, Pr. 1294; 1947 Sess., Assem. Int. 35, Pr. No. 35; Assem. Int. 72, Pr. No. 72.) On the other hand, the Public Housing Law (§ 223), which is applicable to State-constructed, low cost housing projects, expressly prohibits discrimination. There is no claim that the Legislature refused by amendment to make similar provision in the Redevelopment Companies Law because it thought the statute already barred discrimination, and it is undisputed, therefore, that the legislative intent is clear to leave private enterprise free to select tenants of its own choice.

The matter of the exclusion of Negroes from the development arose in connection with the approval by the Governor of the 1943 amendments to the Redevelopment Companies Law and in contract negotiations between Metropolitan and the city. Commissioner Robert Moses, active in the plan, stated publicly to the Governor and the board of estimate that if any requirement was imposed which deprived the landlord of the right to select its tenants, no private venture would go into the business. Certainly the general impression was created — which Metropolitan did nothing to dispel — that Stuyvesant Town would not rent to Negroes. For that reason and others, unsuccessful attacks were made upon the desirability of the project. In the board of estimate at least three votes were cast against approval of the contract on the ground that exclusion on racial grounds would be practiced. The contract was finally approved without any provision regarding discrimination in the selection of tenants. It may be noted in passing that thereafter the New York City Council passed legislation withholding tax exemption from any subsequent redevelopment company unless it gave assurance that no discrimination would be practiced in its rental policies. This provision, however, expressly excluded from its operation any project "hitherto agreed upon or contracted for" (Administrative Code of City of New York, § J41–1.2).

In 1943, respondent Stuyvesant was formed by Metropolitan pursuant to the statute. A contract with the city was approved by the board of estimate of the City of New York in June, 1943. The contract embodied a plan for the rehabilitation of a substandard area comprising eighteen city blocks in the borough of Manhattan by the erection of thirty-five apartment houses capable of accommodating about twenty-five thousand people. Under the contract the City of New York agreed to condemn and bring under one good title the entire area. Stuyvesant agreed to acquire the area, demolish the old buildings and construct new ones, all without expense to the city. Metropolitan agreed to advance the necessary funds to Stuyvesant, guaranteed performance by the latter, and, with Stuyvesant, assumed all risks of the venture. The city granted tax exemption for twenty-five years only to the extent of the enhanced value to be created by the project. Stuyvesant agreed to convey to the city

bordering strips around the periphery of the project in exchange for land in streets which the city agreed to close.

The contract regulates rents at rates intended to yield the statutory limited return, prohibits mortgaging and sale of the project, gives the city certain auditing privileges, and requires payment to the city upon the dissolution of Stuyvesant of any earned cash surplus after payment of all indebtedness. Upon the termination in any way of tax exemption, Stuyvesant may dissolve and convey its property to Metropolitan, and the statute and contract become inapplicable to the project.

In formulating an answer to the questions propounded at the beginning of this opinion we first consider whether there is anything in the Constitution of the State of New York which can be said to impose any broader or different restriction than is contained in the equal protection clauses of the Fourteenth Amendment of the Federal Constitution. Our conclusion is that the problem is precisely the same under the State Constitution as it is under the Federal Constitution.

Section 11 of article I of the State Constitution reads as follows: " No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

The first sentence, which is obviously an equal protection clause, is no more broad in coverage than its Federal prototype, which reads: " No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." (U. S. (Const., 14th Amendt., § 1.) This conclusion follows from the plain meaning of plain words. It is strongly reinforced, however, by the fact that the chairman of the Bill of Rights Committee of the New York State Constitutional Convention of 1938, at which convention the section in question was approved, stated at the convention that the first sentence of section 11 " in effect embodies in our Constitution the provisions of the Federal Constitution which are already binding upon our State and its agencies " (2 Rev. Record of N. Y. State Constitutional Convention, 1938, p. 1065). It is significant that in previous New York cases arising under the equal protection clauses of the

Federal and State Constitutions it has not been suggested that the reach of the latter differed from that of the former (*Kemp v. Rubin,* 298 N. Y. 590; *Madden v. Queens Co. Jockey Club,* 296 N. Y. 249).

The second sentence of section 11 is a civil rights clause and, although applicable to private persons and private corporations, protects only against " discrimination in  *  *  * civil rights ". Obviously such rights are those elsewhere declared. Again this conclusion is strongly supported by the statement of the chairman of the Bill of Rights Committee made at the convention to the effect that the provision in question was not self-executing and that it was implicit that it required legislative implementation to be effective (2 Rev. Record of N. Y. State Constitutional Convention, 1938, p. 1144). Furthermore, it was stated at the convention that the civil rights protected by the clause in question were those already denominated as such in the Constitution itself, in the Civil Rights Law or in other statutes (4 Rev. Record of N. Y. State Constitutional Convention, 1938, pp. 2626–2627). At the 1938 Constitutional Convention attempts to provide explicitly against discrimination in housing in the housing and civil rights articles of the Constitution proved unsuccessful (see, e.g., N. Y. State Constitutional Convention, Pr. Nos. 10, 18, 49, 203, 380, 625, 691). No statute in New York recognizes the opportunity to acquire interests in real property as a civil right, although there are in existence today nearly twenty anti-bias laws covering many fields of activity. The conclusion that the opportunity to acquire such interests in New York is not a civil right is reinforced by the fact that bills introduced in the State Legislature in 1947 and 1948 to amend the Civil Rights Law in order to declare the " opportunity to purchase and to lease real property without discrimination  *  *  * to be a civil right ", failed of passage (see e.g., 1947 Sess., Assem. Int. 34, Pr. No. 34; 1948 Sess., Assem. Int. 128, Pr. No. 128; Assem. Int. 715, Pr. No. 720; and Assem. Int. 1177, Pr. No. 1197; see, also, *Pratt v. La Guardia,* 182 Misc. 462, affd. 268 App. Div. 973, appeal dismissed 294 N. Y. 842).

Our decision then must rest on the co-ordinate commands expressed in the equal protection clauses of the Federal and State Constitutions. For many years it has been unquestioned

that the great prohibitions of the Fourteenth Amendment are addressed to that action alone which "may fairly be said to be that of the States" (*Shelley* v. *Kraemer,* 334 U. S. 1, 13; *Civil Rights Cases,* 109 U. S. 3). Upon that characteristic of the constitutional inhibition these parties have joined issue. Respondents contend that they are private companies, beyond the reach of the constitutional restraint and free to select arbitrarily the tenants who will occupy Stuyvesant Town. Appellants insist that the avowed discrimination falls under the constitutional ban because they say it has been aided and made possible by the action of the State. The issue is decisive, for the policy of respondents could not be followed by a governmental body (cf. *Buchanan* v. *Warley,* 245 U. S. 60).

In an early decision of the Supreme Court under the Fourteenth Amendment we find the statement that " a State acts by its legislative, its executive, or its judicial authorities. It can act in no other way." (*Ex Parte Virginia,* 100 U. S. 339, 347.) In that case the court held the official conduct of a State judge subject to the mandate although he had acted on his own impulse and without authority from the law of the State. Subsequent cases have made it clear that the prohibited action of a State may be exerted through private individuals and corporations. Thus discrimination by private individuals offends the equal protection clause if they act under constraint of State law (*Nixon* v. *Herndon,* 273 U. S. 536; *Buchanan* v. *Warley,* 245 U. S. 60, *supra; Truax* v. *Raich,* 239 U. S. 33).

In a more recent series of cases the Federal courts have held private groups subject to the constitutional restraints when they perform functions of a governmental character in matters of great public interest (*Smith* v. *Allwright,* 321 U. S. 649; *Nixon* v. *Condon,* 286 U. S. 73; *Rice* v. *Elmore,* 165 F. 2d 387, certiorari denied 333 U. S. 875; *Kerr* v. *Enoch Pratt Free Lib.,* 149 F. 2d 212. But compare *Mason* v. *Hitchcock,* 108 F. 2d 134). Speaking of the executive committee of the Democratic Party in the State of Texas, Mr. Justice CARDOZO said: " They are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions ". (*Nixon* v. *Condon, supra,* at p. 88.) The result is unchanged though the

State cast off all fetters upon their discretion (*Rice* v. *Elmore, supra*). The Supreme Court of the United States has indicated that the inhibitions of the Fifth Amendment upon the action of the Federal Government would apply to a labor union whose power to act as sole collective bargaining agent for railroad employees was derived from Federal statute (see *Steele* v. *Louisville & Nashville R. R. Co.*, 323 U. S. 192, 198–199).

In a final group of cases the State has lent its power in support of the actions of private individuals or corporations, and in so doing has clothed the private act with the character of State action (*Shelley* v. *Kraemer, supra*; *Marsh* v. *Alabama*, 326 U. S. 501). In the latter case an Alabama conviction for trespass in disseminating religious literature on the privately owned streets of a company town offended the due process clause of the Fourteenth Amendment. The language of the court indicates that if the right had been asserted in a different context the owner's action itself would have been condemned. Thus (326 U. S., at pp. 505–506): "We do not agree that the corporation's property interests settle the question. The State urges in effect that the corporation's right to control the inhabitants of Chickasaw is coextensive with the right of a homeowner to regulate the conduct of his guests. We cannot accept that contention. Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."

Appellants here rely upon those cases in urging that we must characterize as governmental action the rental policy of Metropolitan and Stuyvesant. They point to the acknowledged contribution made by government to the project — principally the tax exemption amounting to many millions of dollars, and aggregation of the land through use of the city's power of eminent domain and through exchange of bordering tracts for city streets which had been closed. Moreover, we are urged to consider the size of the project as in reality forming a large community within the city.

All of the previous decisions, and others cited, might be distinguished in that they disclose the exertion of governmental power directly to aid in discrimination or other deprivation of

right, or the action of a private group in the exercise of a governmental function. Neither factor is present here, where the State has remained silent and has indicated that the public purpose has been fulfilled by the rehabilitation of a substandard area (*Matter of Murray* v. *La Guardia*, 291 N. Y. 320, *supra*). This conclusion is reinforced by the constitutional provision, hereinbefore referred to, which specifically negated any authorization to State or city to engage in any private business or enterprise in connection with the rehabilitation of substandard areas (art. XVIII, § 10).

However, to rest our decision solely upon conceptual distinction would be to ignore the character of the Constitution which we construe and of the decisions through which the Supreme Court of the United States has preserved its nature as a living instrument of government. The language quoted above from *Marsh* v. *Alabama* (*supra*) has a different ring from the earlier words of *Ex Parte Virginia* (*supra*). The evolution of our society has disclosed State action where doubtless it would not have been found in an earlier day. Institutions created to meet the social and industrial necessities of our times do not respond readily to the simple test enunciated in *Ex Parte Virginia* (e.g., *Marsh* v. *Alabama, supra*). Those considerations might suggest the desirability of holding that the test can be satisfied, and State action discerned, in any case where the State has tolerated discrimination respecting a matter of high public importance. Invocation of the Constitution then might depend upon a balance of the two values asserted — here the privilege of Metropolitan and Stuyvesant as against the right of appellants to equality of treatment.

Such a development in constitutional law would clash with a fundamental policy inherent in the Fourteenth Amendment and the decision of the *Civil Rights Cases* (109 U. S. 3, *supra*). Both are instinct with the idea that the rights defined in the amendment are to be protected by the States against the actions of private individuals. That high responsibility of the States, implicit in our Federal system, indicates that the political processes must furnish the appropriate means for extension of those rights in areas wherein they have not been heretofore asserted. The unquestioned value of that system suggests the limits to the expanding concept of State action, which has hitherto been found

only in cases where the State has consciously exerted its power in aid of discrimination or where private individuals have acted in a governmental capacity so recognized by the State.

The State of New York has consciously and deliberately refrained from imposing any requirement of nondiscrimination upon respondents as a condition to the granting of aid in the rehabilitation of substandard areas. Furthermore, it has deliberately refrained from declaring by legislation that the opportunity to purchase and lease real property without discrimination is a civil right. To say that the aid accorded respondents is nevertheless subject to these requirements, on the ground that helpful co-operation between the State and the respondents transforms the activities of the latter into State action, comes perilously close to asserting that any State assistance to an organization which discriminates necessarily violates the Fourteenth Amendment. Tax exemption and power of eminent domain are freely given to many organizations which necessarily limit their benefits to a restricted group. It has not yet been held that the recipients are subject to the restraints of the Fourteenth Amendment.

The increasing and fruitful participation of government, both State and Federal, in the industrial and economic life of the nation — by subsidy and control analogous to that found in this case — suggests the grave and delicate problem in defining the scope of the constitutional inhibitions which would be posed if we were to characterize the rental policy of respondents as governmental action. To cite only a few examples: the merchant marine, air carriers and farmers all receive substantial economic aid from our Federal Government and are subject to varying degrees of control in the public interest. Yet it has never been suggested that those and similar groups are subject to the restraints upon governmental action embodied in the Fifth Amendment similar to the restrictions of the Fourteenth upon the States. We do not read the language in *Steele* v. *Louisville & Nashville R. R. Co.* (323 U. S. 192, *supra*) as implying such a suggestion. Such restraints as have been imposed upon their freedom of action are derived from statute or common law, and we feel that those sources of control are the most appropriate.

We are agreed that the moral end advanced by appellants cannot justify the means through which it is sought to be attained. Respondents cannot be held to answer for their policy under the equal protection clauses of either Federal or State Constitution. (The aid which the State has afforded to respondents and the control to which they are subject are not sufficient to transmute their conduct into State action under the constitutional provisions here in question.)

The judgment in Dorsey v. Stuyvesant Town Corp. should be affirmed, with costs, and the appeal in Polier v. O'Dwyer should be dismissed, with costs.

FULD, J. (dissenting). Undenied and undeniable is the fundamental proposition that "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality ". (*Hirabayashi* v. *United States,* 320 U. S. 81, 100.) The average citizen, aware of that truth but unschooled in legal niceties, will, I venture, find the decision which the court now makes extremely perplexing. While the Stuyvesant Town housing project was in blueprint and under construction, the public understood, and rightly, that it was an undertaking on which the State and the City of New York had bestowed the blessings and benefits of governmental powers. Now that the development is a reality, the public is told in effect that, because the Metropolitan Life Insurance Company (hereafter referred to as Metropolitan) and Stuyvesant Town Corporation (hereafter called Stuyvesant) are private companies, they are not subject to the equal protection clause, and may, if they choose, discriminate against Negroes in selecting tenants. That conclusion strikes me as totally at odds with common understanding and not less so with the facts and circumstances disclosed by the record.

In the City of New York as well as in other communities of this State, there are blighted areas whose rehabilitation has been the concern of public bodies for many years. Bent upon " the clearance, replanning, reconstruction and rehabilitation " of such areas, the People in 1938 adopted a new constitutional provision dealing with housing (N. Y. Const., art. XVIII). In aid of those purposes, the Legislature enacted the Redevelopment Companies Law (L. 1942, ch. 845, as

amd. by L. 1943, ch. 234 and L. 1947, ch. 840; McKinney's Unconsol. Laws, §§ 3401–3426). After announcing the State's concern over the existence of substandard and insanitary conditions which impaired real estate values, jeopardized public revenues, and depressed living standards, the Law declared that ("these conditions cannot be remedied by the ordinary operations of private enterprise "|(§ 2). Though providing that the actual work was to be done by privately owned redevelopment companies (§ 4), the statute acknowledged and recognized that there was need for " the cooperation of the state and its subdivisions " (§ 2).

The co-operative activities set forth in the statute demonstrate that the state and city governments were to have a deep interest in, and a close connection with, these redevelopment enterprises. Not only did it fix their maximum rents and profits but it laid down careful limitations with respect to their financing and mortgaging, the selling or disposing of the property and the altering of the structures (§§ 15, 23). To the city governments, the statute gave authority to approve any plan for a proposed development, and power to include, by contract, provisions for the " operation and supervision of the project " (§ 15). In addition, the City was enabled to use certain of its governmental powers to aid the work. It was empowered to condemn property by eminent domain in order to assemble the area to be rehabilitated, and then to convey the property to the redevelopment companies at cost (§ 20); to close off and transfer public streets; and to grant tax exemption on the improvements for a twenty-five-year period (§ 26). In sum, the companies and the enterprises were to be governmentally aided and effectuated, as well as supervised and regulated, in numerous ways.

In 1943, Metropolitan caused Stuyvesant to be formed pursuant to the statute. There followed negotiations, between the City on the one side and Stuyvesant and Metropolitan on the other, which culminated in a contract embodying a plan for the rehabilitation of a substandard area comprising eighteen city blocks in Manhattan, running north from East 14th Street to East 20th Street, and running east from First Avenue to the East River Drive or Avenue C. The plan and the proposed contract received the requisite approval from the State Superintendent of

Insurance, from the Planning Commission and from the Board of Estimate of the City of New York. Following closely the contours of the Redevelopment Companies Law, the contract called for condemnation by the City of the site and its conveyance to Stuyvesant at cost; for grant by the City to Stuyvesant of all public streets within the project in return for an equivalent area on its periphery; and for tax exemption on improvements for twenty-five years. For its part, Stuyvesant agreed to acquire the area, demolish the old buildings and construct the Stuyvesant project. Metropolitan was to advance the necessary funds and to guarantee performance by Stuyvesant.

Condemnation of the land and its transfer to Stuyvesant, along with public streets, was accomplished in 1945, and construction of Stuyvesant Town began in that same year. The Town is now virtually completed, at a cost of over $90,000,000. It occupies eighteen city blocks and, with its thirty-five buildings, houses a population of about twenty-five thousand people. Streets in the area are " private " and signs at all entrances give the public notice of that fact.

Almost from the beginning, the question of exclusion of Negroes from the community was debated. While the project was under consideration by the Board of Estimate, Stuyvesant and Metropolitan insisted that they be given free choice in the selection of tenants and indicated that they planned to bar Negroes. Despite opposition to the contract on that ground, its execution was authorized. A local law was thereafter passed by the city forbidding racial discrimination in tax-exempt developments, but it expressly excepted from its coverage any project " hitherto agreed upon or contracted for " (N. Y. C. Administrative Code, § J41–1.2) — an exception which could relate only to Stuyvesant Town.

Though I digress for a moment, it is my opinion that there are present in the foregoing recital many factors which spell out governmental participation in illegal discrimination. Especially in the two items last mentioned, namely, the city contract sanctioning the very discrimination complained of and the city legislation actually ratifying that discriminatory conduct, do I find most clearly that " state action " which the Federal Constitution interdicts.

It is, of course, against the total background that we weigh appellants' claim that the admitted discrimination violates the

equal protection clauses of the Federal and State Constitutions. The court has rejected that claim on the ground that such discrimination has neither been aided by the " consciously exerted " power of the State nor performed by private individuals acting in a recognized " governmental capacity " (pp. 534–535). For that reason, it is held, the discrimination does not fall within the constitutional restraints. I cannot believe that the requirement of equal protection permits of such artificial qualifications or that the constitutional provisions designed to guarantee it are written in such gossamer phrases that formalities of that sort can obscure fundamentals. Doubly pertinent here is Chief Justice MARSHALL's century-old injunction that " we must never forget * * * it is *a constitution* we are expounding." (*M'Culloch* v. *Maryland,* 4 Wheat. [U. S.] 316, 407.)

The Fourteenth Amendment of the Federal Constitution, insofar as relevant, provides that " No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." The Amendment, it is true, does not operate against purely private conduct (*Civil Rights Cases,* 109 U. S. 3), but it does prohibit discrimination even by private persons or agencies if such action can " fairly be said " to be that of the State. (See *Shelley* v. *Kraemer,* 334 U. S. 1, 13.) The concept of " state action " has enjoyed a career of aggressive expansion during the sixty-six years since the *Civil Rights Cases* were decided. (109 U. S. 3.) It is no longer confined, if ever it was, merely to those affirmations of state authority which take the form of legislative enactments. It " refers to exertions of state power in all forms " (*Shelley* v. *Kraemer,* 334 U. S. 1, 20, *supra*), and has " the effect * * * of protecting the rights of individuals and minorities from many abuses of governmental power which were not contemplated at the time " of the Amendment's adoption. (*Rice* v. *Elmore,* 165 F. 2d 387, 392, certiorari denied 333 U. S. 875.)

As long as there is present the basic element, an exertion of governmental power in some form, as long as there is present something " more " than purely private conduct (see *Shelley* v. *Kraemer,* 334 U. S. 1, 13, *supra*), the momentum of the principle carries it into areas once thought to be untouched by its direction.

For example, a private individual who practices discrimination under the constraint of state power violates the equal pro-

tection clause. (See, e.g., *Buchanan* v. *Warley,* 245 U. S. 60; *Truax* v. *Raich,* 239 U. S. 33.) In the latter case (*Truax* v. *Raich*), it was the action of a private employer, in discharging an alien pursuant to a statute limiting aliens to a stated percentage of the working force, that was deemed to deny equal protection. Similarly, a private association, a labor union, clothed with statutory power to bargain for a craft, has been implied to be under a constitutional duty to discharge its functions without discriminating against Negroes. (See *Steele* v. *Louisville & Nashville R. R. Co.,* 323 U. S. 192, 198.) Indeed, even without a formal delegation of powers — formal in the agency sense — a private group is subject to the equal protection clause while it acts in a matter of high public interest with the aid of the State (see *Smith* v. *Allwright,* 321 U. S. 649; *Nixon* v. *Herndon,* 273 U. S. 536) or with the sufferance and acquiescence of the State even without its aid. (See *Rice* v. *Elmore,* 165 F. 2d 387, certiorari denied 333 U. S. 875, *supra.*) Thus, for instance, in the *Rice* case — which stamps as unsupportable the court's rejection (opinion, p. 534) of the proposition that "state action" is to be discerned "in any case where the State has tolerated discrimination respecting a matter of high public importance" — it was the unaided action of a private voluntary political association which denied equal protection to the Negro. Not even the formal disavowal on the part of the State of all interest in the process of selecting political candidates — by repealing all of its pertinent statutes — served to free "private" political parties from the duty to function without discrimination. Finally under recent decisions of the Supreme Court, private discriminatory conduct, freely and voluntarily initiated by private individuals, has been declared to violate the equal protection principle when facilitated or rendered effective by an assertion of state power. (See, e.g., *Shelley* v. *Kraemer,* 334 U. S. 1, *supra*; cf. *Marsh* v. *Alabama,* 326 U. S. 501.)

As the majority opinion recognizes (p. 534), the Fourteenth Amendment is no longer satisfied by a mechanical finding that the discriminatory conduct was not perpetrated by legislative, judicial or executive officials of the State. The concept of "state" action has been vitalized and expanded; the definition

of " private " conduct in this context has been tightened and restricted. When private individuals or groups move beyond " matters of merely private concern " and act in " matters of high public interest ", the test is not, Mr. Justice CARDOZO has written, whether they are " the representatives of the State in the strict sense in which an agent is the representative of his principal. The test is whether they are to be classified as representatives of the State to such an extent and in such a sense that the great restraints of the Constitution set limits to their action." (*Nixon* v. *Condon*, 286 U. S. 73, 88–89.)

The fact that the constitutional right is invaded in the exercise of " private " property interests is no more decisive than that the owner himself is " private ". In *Marsh* v. *Alabama* (326 U. S. 501, *supra*), for instance, a Jehovah's Witness was convicted of trespass, in spite of her claim of constitutional right, for refusing to leave the streets of a company town completely owned by a private corporation. Relying upon its " private " proprietary rights, the owner urged that the Fourteenth Amendment was inapplicable to it, but the Supreme Court declared (pp. 505–506) : " We do not agree that the corporation's property interests settle the question. The State urges in effect that the corporation's right to control the inhabitants of Chickasaw is coextensive with the right of a homeowner to regulate the conduct of his guests. We cannot accept that contention. Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."

A kindred philosophy outlaws the enforcement of privately drawn restrictive covenants aimed at nonwhite ownership of property. (See *Shelley* v. *Kraemer*, 334 U. S. 1, *supra*.) It also runs through the numerous decisions which deny to the State and its subdivision, a city, the power to avoid their constitutional responsibilities by leasing or assigning to private persons important projects or functions in which discrimination is practiced. (See, e.g., *Lawrence* v. *Hancock*, 76 F. Supp. 1004; *Kern* v. *City Commissioners of City of Newton*, 151 Kan. 565; *Culver* v. *City of Warren*, 83 N. E. 2d 82 [Ohio App.].)

The teaching of this body of law is clear. On the one hand, the equal protection clause does not prohibit private persons from exercising rights of private ownership in matters merely private, however arbitrarily or capriciously they may discriminate. On the other hand, even the conduct of private individuals offends against the constitutional provision if it appears in an activity of public importance and if the State has accorded the transaction either the panoply of its authority or the weight of its power, interest and support.

Respondents' main defense to the charge of constitutional violation is that they, rather than the City, are behind the discrimination, and that they, as private corporations, are not answerable for it. Their premise is faulty. Stuyvesant is in no sense an ordinary private landlord. Its title bespeaks its character. With buildings covering many city blocks, housing a population of twenty-five thousand persons, Stuyvesant is a " Town " in more than name. Its very being depended upon constitutional amendment, statutory enactment and city contract. The exercise of a number of governmental functions was absolutely prerequisite to its existence. As a geographic entity, Stuyvesant Town was created by the City's exercise of its eminent domain and street-closing powers and by its act of transferring such condemned land and public property to respondents. As an economic enterprise, Stuyvesant Town was made possible by the acquisition of this land at its cost to the City — not augmented by reason of any increase in value through assembly of the entire tract under single ownership — and by the City's grant of tax exemption. As a going community, Stuyvesant Town functions subject to supervision by governmental agencies. Upon dissolution, its surplus assets revert to the public. All in all, the resemblance between Stuyvesant Town and the company town of *Marsh* v. *Alabama* (326 U. S. 501, *supra*) is strong, the analogy between this case and that one, clear.

To intimate that this is just another instance of a government subsidy is to misconceive the case. To claim that the construction and operation of a project such as Stuyvesant is a matter of but private concern is to disregard the obvious. Unmistakable are the signs that this undertaking was a governmentally conceived, governmentally aided and governmentally regulated project in urban redevelopment.

Everywhere in evidence are the voice and authority of the State and the City. Approval of the underlying constitutional housing article set in motion numerous governmental acts necessary to accomplish the " reconstruction and rehabilitation " of slum areas and to provide " incidental  *  *  * facilities " (§ 1). Proceeding under that authority, the Legislature had in view more than merely the effacement or razing of blighted substandard buildings; their " modernization " and " reconstruction " to provide " adequate, safe, sanitary and properly planned housing accommodations in effectuation of official city plans " were declared to be " public uses and purposes " (§ 2). And it was to achieve all these ends — not merely the clearance of a slum area — that the plans for Stuyvesant Town were conceived and executed, that the City condemned property for use by defendants, closed public streets and turned over their land area — comprising 19% of the total area of the project — granted tax exemption upon improvements and insisted upon regulation of the rents, profits and financing methods of the redevelopment corporation.

That there is " state action " here is supported and established, however, by more than the constitutional and statutory provisions which made the development possible, by more than the city and state participation and aid that brought Stuyvesant Town into being. (In addition, there is the exceedingly significant fact that the City's Board of Estimate approved and authorized the contract for the construction and operation of Stuyvesant Town after having been apprised by city representatives and company officials that Negroes would be excluded from the development./ Beyond that, the City Council deliberately excepted Stuyvesant from the coverage of the law, subsequently enacted, which barred discrimination in tax-exempt projects. In a most literal sense, in a most direct way, here was " action," and — if such a showing were necessary (but see, contra, *Steele* v. *Louisville & Nashville R. R. Co.*, 323 U. S. 192, *supra*) — action, " consciously exerted," by the State " in aid of " the discrimination being practiced (opinion, p. 535). To suggest that the Constitution's command does not apply because such action was not exerted " directly " in aid of the discrimination (opinion, p. 533), is to overlook the nature of the case. We cannot close our eyes to what led to the end

.result, nor properly hold that the final product of that action should be considered and appraised without regard to its roots or its background. Nothing to the contrary was decided in *Matter of Murray* v. *La Guardia* (291 N. Y. 320), wherein this court simply upheld the constitutionality of the exercise of eminent domain powers to assemble the area to be cleared.

If the City had zoned the site of Stuyvesant Town and closed it to Negroes, no one would doubt that the equal protection clause had been violated. (See *Buchanan* v. *Warley*, 245 U. S. 60, *supra*.) If the City, instead of doing that, had built a similar development and leased it to private operators for occupancy by white tenants only, the discrimination would have been condemned with equal vigor. Here, instead of a zoning ordinance or a city lease, there is a city-approved and city-executed contract, providing for a housing project from which it was realized Negroes would be barred, and a city law ratifying that discrimination. No one claims or even suggests that the City adopted an alternative strategem to effect discrimination, but it may not be gainsaid that the development plan, the contract and the local law brought about precisely the same situation as if the City had zoned or leased a " white " development. We draw distinctions too fine and too subtle when we say that the several cases are different or that they merit different consideration.

It is my conclusion, then, that the Fourteenth Amendment proscribes discrimination in Stuyvesant Town. And, since the equal protection clause of the Constitution of New York State (art. I, § 11) is at least as broad in coverage as its Federal counterpart, it is likewise my conclusion that the State Constitution also condemns it.

It is vehemently urged that to hold that Stuyvesant must discontinue its discriminatory practices would be to deprive respondents of an advantage implicit in their bargain with the City. The flaw in that argument is that the unseen protocol being relied upon was lawless from the start and may not be given effect. The argument overlooks that the constitutional rights of American citizens are involved and that such rights may not be used as pawns in driving bargains; respondents may not, by making a contract and bargain, succeed in avoiding the restraints imposed by Federal and State Constitutions upon their rights and powers. As Mr. Justice HOLMES observed,

"One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." (*Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 357.) In brief, the vice of the bargain asserted lies in its very effort to accomplish forbidden discrimination. In point of fact, the argument advanced proves too much. Insofar as respondents rely upon a bargain with the City for discrimination, we have confirmation indisputable that state action was present. If, on the other hand, respondents do not insist that there was such an agreement, they may not complain that they were led by the City to believe that they could practice discrimination.

As an enterprise in urban redevelopment, Stuyvesant Town is a far cry from a privately built and privately run apartment house. More, its peculiar features yield to those eligible as tenants tremendous advantages in modern housing and at rentals far below those charged in purely private developments. As citizens and residents of the City, Negroes as well as white people have contributed to the development. Those who have paid and will continue to pay should share in the benefits to be derived. Stuyvesant Town in its role as chosen instrument for this public purpose may not escape the obligations that accompany the privileges accorded to it.

It is impossible to balance the essence of democracy against fireproof buildings and well-kept lawns, and, fortunately, the Constitutions, Federal and State, forbid our putting the former into the judicial scales just as they forbade the city officials from putting it upon the bargaining table. The mandate that there be equal protection of the laws, designed as a basic safeguard for all, binds us and respondents as well to put an end to this discrimination.

I would reverse in the Dorsey action.

In Dorsey v. Stuyvesant Town Corp.; Lewis, Conway and Dye, JJ., concur with Bromley, J.; Fuld, J., dissents in opinion in which Loughran, Ch. J., and Desmond, J., concur.

Judgment affirmed.

In Polier v. O'Dwyer; Loughran, Ch. J., Lewis, Conway, Desmond, Dye and Fuld, JJ., concur.

Appeal dismissed.