In the Matter of STUYVESANT TOWN CORPORATION et al., Petitioners, against VINCENT R. IMPELLITTERI et al., Constituting the Board of Estimate of the City of New York, et al., Respondents.

Supreme Court, Special Term, New York County, July 2, 1952.

*C. Frank Reavis, Jeremiah M. Evarts* and *Martin D. Jacobs* for petitioners.

*Denis M. Hurley, Corporation Counsel* (*W. Bernard Richland, Pauline K. Berger, Bernard Friedlander* and *Barbara Carroll* of counsel), for respondents.

*William L. Messing* for tenants, *amici curiæ*.

HAMMER, J.   This is a proceeding under article 78 of the Civil Practice Act to review a determination of the board of estimate of the City of New York, to set aside and annul that determination, and to grant the application of petitioners to increase the maximum average basic rental per month per room to an amount sufficient to provide the sums for interest, amortization and dividends under and pursuant to the terms of the contract between petitioners and the City of New York.

The petitioners Metropolitan Life Insurance Company and Stuyvesant Town Corporation entered into an agreement with the City of New York, dated June 1, 1943, respecting the acquisition of real property for and the financing, construction, operation and supervision of the redevelopment project known as Stuyvesant Town.   This agreement was made pursuant to the provisions of the Redevelopment Companies Law (L. 1942, ch. 845, as amd. by L. 1943, ch. 234).

The statute was enacted by the State Legislature pursuant to the power conferred upon the Legislature by article XVIII of the State Constitution.   By that constitutional provision, the Legislature was given exclusive and plenary power to adopt legislation in order to accomplish the constitutional purpose of rehabilitation of substandard and insanitary areas, that is, slum clearance (N. Y. Const., art. XVIII, § 1).   As amended in 1943, the statute provided a procedure for the accomplishment of this constitutional purpose by enabling municipalities to enter into contracts with redevelopment companies and insurance companies respecting the acquisition of real property for

and the financing construction, operation and supervision of redevelopment projects.

Briefly summarized, the scheme of the statute authorizes the board of estimate to negotiate and approve contracts by which private capital may be provided (usually by insurance companies) for the rehabilitation of substandard areas; the city is authorized to grant partial tax exemption to such projects; a limited return of 6% of total actual final cost is to be assured to the redevelopment company during the period of partial tax exemption; and the statute directs that the contract shall regulate the rents to be charged for rooms in the project.

Section 15 provides that after the project plan has been approved by the city planning commission, the proposed form of contract shall be submitted to the board of estimate for its approval. Section 15 further provides that such contract " shall regulate the rents to be charged for rooms in the project and may contain such other provisions, not inconsistent with this act, as may be deemed necessary or desirable for the financing, construction, operation and supervision of the project."

Section 26 authorizes the board of estimate to grant by the contract partial tax exemption for a period of not more than twenty-five years.

Section 8 of the statute, in providing a limited return upon the investment in the redevelopment project, declares that, during the period of partial tax exemption, " there shall be paid annually out of the earnings of the redevelopment company, after providing for all expenses, taxes and assessments, a sum for interest, amortization, depreciation and dividends, equal to but not exceeding six per centum of the total actual final cost of the project as defined by subdivision two of section thirteen of this act; the obligation in respect of such payments shall be cumulative, and any deficiency in interest, amortization, depreciation and dividends in any year shall be paid from the first available earnings in subsequent years; and any cash surplus derived from earnings remaining in the treasury of the redevelopment company in excess of the amount necessary to provide such cumulative annual sums shall, upon dissolution of the company, be paid into the general fund of the municipality."

This statutory scheme was implemented in the Stuyvesant contract in the following manner:

In accordance with section 8 of the statute, the contract between the petitioners and the city provided in paragraph 304 for a return to the petitioner Metropolitan, during the period

of partial tax exemption (granted in par. 306), of 6% of the total actual final cost of project. Pursuant to the requirement of section 15 of the statute that the contract should regulate rentals to be charged for rooms in the project, suitable provisions for the regulation of rentals, during the period of partial tax exemption, are contained in paragraph 307 of the contract.

This paragraph 307 provides that if the revenue derived from the stated rental should prove insufficient to provide the return of 6% per annum of the total actual final cost of the project, then Stuyvesant could make application to the board of estimate for permission to increase the maximum average rental per month per room. Upon such application, the corporation should offer evidence that, under the existing rental, it is not possible to pay annually out of available earnings the sums for interest, amortization and dividends accruing under paragraph 304 of the contract. It further provides that if, upon public hearing, " such facts shall be established by a preponderance of the credible evidence," then: " the Board of Estimate shall grant the application of the Corporation to increase the maximum average rental per month per room by an amount sufficient to provide such sums annually thereafter and to provide the sums for interest, amortization and dividends theretofore accumulated and unpaid."

Paragraph 307 then continues: " If after such hearing the Board of Estimate refuses to grant the application of the Corporation as and to the extent requested, then the Corporation shall have the right to cause the action of the Board of Estimate to be reviewed by instituting an appropriate proceeding under Article 78 of the Civil Practice Act for such purpose."

As the Court of Appeals said in *Dorsey* v. *Stuyvesant Town Corp.* (299 N. Y. 512, 530, certiorari denied 339 U. S. 981): " The contract regulates rents at rates intended to yield the statutory limited return ".

When the original agreement was entered into in June, 1943, the cost of the project could only be estimated. At that time the total actual final cost was estimated at $60,000,000. Paragraph 307 of the contract, in the first instance, provided a maximum average rental of $14 per month per room. This rental, together with other project revenue from stores, etc., was then believed sufficient to yield the 6% return upon that estimated cost.

Before any of the residential buildings in the project were ready for occupancy, it became apparent that the total actual final cost of the project would be in excess of $90,000,000 and

that the stated rental of $14 would be insufficient to yield the return prescribed by the statute and the contract. Accordingly, in June, 1947, Metropolitan and Stuyvesant requested the city to amend paragraph 307 of the contract by increasing the stated maximum average rental from $14 to $17 per month per room. The city agreed to amend the contract as requested and the parties entered into a supplemental agreement dated as of June 13, 1947. At that time, Metropolitan and Stuyvesant agreed, at the request of the board of estimate, to make no further application for an increase of the maximum average rental to become effective prior to October 1, 1951. By that time the project would be completed, its total actual final cost determined, and at least a year of operating experience would intervene so that actual operating costs could be ascertained.

By the end of 1950 petitioners show that they became aware that the final cost of the project would be about $112,000,000. They allege that experience in operating the project showed that the cost of operation was considerably in excess of the estimated operating cost. They asserted that to get a 6% return on the cost (without any consideration of the accrued past deficit) an increase of $6.10 would be necessary. The petitioners by letter dated December 30, 1950, suggested to the board of estimate that paragraph 307 again be amended by increasing the stated maximum average rental, not by the full allowable amount, but by $4 per room from $17 to $21 per month per room, such increase to become effective October 1, 1951. A proposed form of agreement to make such change effective was submitted to the board. The matter was referred to the comptroller in the month of January, 1951.

Over a period of eight months, the comptroller's representatives made a complete audit of the accounts of Metropolitan and Stuyvesant respecting the total actual final cost and the operating expenses and revenues of the project. This audit was concluded in October, 1951, and the item was considered by the board at its meeting of October 11, 1951. The board received the report of the comptroller, in which he stated: " I am satisfied that the figures submitted by Metropolitan are substantially correct." The board of estimate, however, refused to amend the contract.

Under date of January 11, 1952, petitioners filed an application under the procedure established in paragraph 307, which was required by section 15 of the statute. They allege that proof was submitted in the form of duly certified financial exhibits showing (1) the total actual final cost as of September

30, 1951, (2) the revenues for the twelve months ending September 30, 1951, and the increase in maximum average rental necessary to yield the prescribed return, (3) the accumulated unpaid deficiency in that return existing as of September 30, 1951, and (4) the maximum average rental necessary to yield the 6% return and provide for the accumulated unpaid deficiency during the remaining period of partial tax exemption.

The schedules demonstrated that the total actual final cost of the project to September 30, 1951, was $112,210,057.64; that the maximum average rental to yield the 6% return on such total actual final cost would have to be increased by $6.83 per month per room; that the accumulated unpaid deficiency as of September 30, 1951, amounted to $9,419,074.42; that the present average rental of $17 per room yields a return of only 3.57%; and that the total maximum average rental per month per room necessary to yield the return and provide, during the remaining period of tax exemption, for the payment of the accumulated unpaid deficiency as of September 30, 1951, is $24.87. (Stuyvesant, it is noted, is not subject to the State Residential Rent Law of the State of New York. Nevertheless, it may be observed in passing that under that law the owner is entitled to a return of 4% on the valuation of the property, after an allowance of 2% for depreciation on the value of the buildings [L. 1946, ch. 274, § 4, subd. 4, par. (a) as amd.].)

The application was referred to the comptroller on January 24, 1952. The accounts were again audited and brought down to date by the comptroller's representatives. The comptroller reported that the facts and figures as stated in the application were correct.

At the hearing before the board of estimate on May 19, 1952, the deputy comptroller recalled that the comptroller had already stated that the figures submitted by the petitioners were substantially correct.

" The Comptroller submitted a report to this Board under date of October 9th, 1951. The Board acted on that. The figures contained in that report are substantially the same and are still correct.

" Notwithstanding the report I am now submitting a resolution on behalf of the Comptroller, and I would ask the Clerk to please read the resolution slowly.

" The Clerk: (Reads) Resolved by the Board of Estimate that the application of Stuyvesant Corporation and Metropolitan Life Insurance Company to increase the maximum average rental per month per room at Stuyvesant Town from $17 to

$24.87, pursuant to paragraph 307 of the Contract, dated June 1, 1943 between the applicant and the City of New York, be, and the same is hereby denied.''

The resolution was adopted.

The respondents urge that the Redevelopment Companies Law had a two-fold purpose, namely, private investment not only in slum clearance but also in middle-income housing. It is contended that the rent regulation amendment of the Redevelopment Companies Law in 1943 must have been intended to provide that the project would remain a middle income housing project during the period of tax exemption. In the circumstances, it is concluded that paragraph 307 of the contract does not divest the board of estimate of discretion to deny an application for a rent increase, when it appears that such increase would transform the project into housing beyond the reach of middle-income groups. To hold otherwise, it is asserted, would constitute the board of estimate a mere rubber stamp obligated to authorize a rent increase in conformity to a mathematical formula.

Certain of the tenants on behalf of themselves and others similarly situated made application to intervene as parties in this proceeding. In this application two tenant organizations joined. The application was granted to the extent that all were authorized *amici curiæ* to examine either through counsel or through privately engaged accountants all the records, papers and documents submitted by petitioners and respondents upon this proceeding, as well as by the comptroller and his assistants, and submit to the corporation counsel for submission to the court any certified or verified accountant's reports thus obtained. They were also permitted to submit to the court such memoranda, relevant and material to the above, as they might be advised. The order made thereon was affirmed by the Appellate Division on June 27, 1952. (280 App. Div. 788.) As *amici curiæ* the applicants were afforded the same time and extended time to file papers and memoranda as was given to the city, whose position they were seeking to sustain. They did not avail themselves of the opportunities thus afforded, merely setting forth in a letter of their counsel two propositions which they believed had not been developed by the corporation counsel.

The scope and purpose of the redevelopment statute and the very contract now before the court were analyzed at length by our Court of Appeals in two cases in which the city was a party. In *Matter of Murray* v. *LaGuardia* (291 N. Y. 320) it was said:

" The broad powers given to the Legislature by those new provisions of the Constitution quoted above are the bases for the enactment of the Redevelopment Companies Law * * *.

" In the present case we are concerned with only one of the two separate grants of power stated in section 1 of article XVIII — that single grant of power being to — ' provide in such manner, by such means and upon such terms and conditions as it [the Legislature] may prescribe * * * for the *clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas* * * * and for recreation and other facilities incidental or appurtenant thereto.' " (P. 327.) * * *

"There remains for consideration the charge that the Redevelopment Companies Law is unconstitutional because it is not confined to slum clearance and to reconstruction for former slum dwellers. The answer, we think, is found in the significant use of the word ' or ' in article XVIII, section 1. That constitutional provision grants to the Legislature authority to provide for low rent housing for persons of low income, ' *or* ' to provide for ' the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas.' Authorization is thus given to the Legislature to accomplish either of those two purposes ' or for both such purposes '. The two purposes, however, are distinct, one being designed to authorize low rent housing for persons of low income as defined by law, the other authorizing appropriate legislation to bring about the clearance and rehabilitation of substandard areas as a means to protect public health and morals and to restore and preserve the financial stability of municipalities which suffer indirectly from conditions existing in those blighted districts. (See New York State Constitutional Convention [1938], Revised Record, vol. II, pp. 1533, 1559, 1567, 1568, 1577, 1581.) *The project with which we are now concerned involves the clearance and rehabilitation of a substandard and insanitary area — not low rent housing for persons of low income.*

" The People by the adoption of article XVIII of the State Constitution, and the Legislature, by the enactment of the Redevelopment Companies Law, have recognized that the sinister effect of substandard, insanitary areas, wherever slums exist, exerts a malign influence upon the community at large and thus justifies public control and corrective measures. The corrective statute with which this proceeding is concerned is an effort by the Legislature to promote co-operation between municipal government and private capital to the end that substandard,

insanitary areas in our urban communities may be rehabilitated." (Pp. 331–332, emphasis supplied.)

In *Dorsey* v. *Stuyvesant Town Corp.* (274 App. Div. 992, affd. 299 N. Y. 512, *supra*) the decision necessarily rested directly on the validity and subsistence of the written contract entered into on the 1st day of June, 1943, by the City of New York with Stuyvesant Town Corporation and Metropolitan Life Insurance Company. The opening statement in the majority opinion is that " This appeal, involving two actions upon a consolidated record, raises the important question of whether a corporation organized under the Redevelopment Companies Law has the privilege, admittedly possessed by an ordinary private landlord, to exclude Negroes from consideration as tenants." (P. 520.) Later (pp. 521–522), it is stated:

" Stuyvesant Town was built pursuant to a contract between the City of New York, Metropolitan and its wholly owned subsidiary Stuyvesant. The latter was organized by the former in 1943 as a redevelopment company under the Redevelopment Companies Law. Stuyvesant is a private corporation, all of its stock and debentures being owned and all of its working capital having been provided by Metropolitan. The entire cost of acquisition of the land in the project area and of the construction project has been advanced by Metropolitan. It represents an investment of not less than $90,000,000 of private funds held by Metropolitan for the benefit of its more than thirty-three million policyholders.

" The project has been constructed in accordance with a plan approved by the city planning commission and the board of estimate of the City of New York, and the contract above referred to was approved by the State Superintendent of Insurance and the board of estimate, pursuant to the requirements of section 15 of the Redevelopment Companies Law."

Still further (pp. 524, 525) it is pointed out: " Section 2 of the Redevelopment Companies Law provides as follows: ' * * * It is hereby declared that in certain areas of municipalities located within this state there exist substandard conditions and insanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters; that there is not in such areas a sufficient supply of adequate, safe and sanitary dwelling accommodations properly planned and related to public facilities; that modern standards of urban life require that housing be related to adequate and

convenient public facilities; that the aforesaid substandard and insanitary conditions depress and destroy the economic value of large areas and by impairing the value of private investments threaten the sources of public revenues; that the public interest requires the clearance, replanning, reconstruction and neighborhood rehabilitation of such substandard and insanitary areas, together with adequate provision for recreational and other facilities incidental and appurtenant thereto according to the requirements of modern urban life and that such clearance, replanning, reconstruction and neighborhood rehabilitation are essential to the protection of the financial stability of such municipalities; * * * that provision must be made to enable insurance companies to provide such facilities, subject to regulation by law as to the return from such facilities and the disposition of property acquired for such purpose; and that provision must also be made for the acquisition for such corporations and companies at fair prices of real property required for such purposes in substandard areas and for public assistance of such corporations and companies by the granting of partial tax exemption ''.

The decision sets forth a most painstaking consideration of every provision of the Redevelopment Companies Law applicable to the status, rights and obligations of the parties under the contract. It is pointed out (pp. 527, 529–530 and 531–532) specifically that:

'' It also provides that no such company shall issue stock, debentures and bonds in an amount greater than the total actual final cost of the project and that no contract shall be made for the payment of salaries to officers or employees, or for the construction, substantial repair, improvement or operation of projects except subject to the approval of the supervising agency. The supervising agency referred to means only the Superintendent of Insurance where, as here, an insurance company owns the stock and debentures of a redevelopment company, and if, as here, a contract is entered into the parties to which are a municipality, a redevelopment company and an insurance company, the supervising agency shall have no continuing power of supervision once it shall have approved the contract (§§ 3, 15). This means that the general power of visitation, examination and control provided for by section 21 is inapplicable to Stuyvesant. There are other limitations upon methods of financing, mortgage, sale or disposition of property and alteration of structures (§§ 9, 10, 11, 12, 14, 16, 23).

" Section 15 sets up a procedure for the submission and approval of a plan of a proposed project which requires the prior approval of the supervising agency and the local planning commission. Thereafter a contract shall be proposed which, prior to its execution, must be approved by the local legislative body. It is provided that the contract shall regulate the rents to be charged and may contain other provisions for the financing, construction, operation and supervision of the project."

\* \* \*

" In 1943, respondent Stuyvesant was formed by Metropolitan pursuant to the statute. A contract with the city was approved by the board of estimate of the City of New York in June, 1943. The contract embodied a plan for the rehabilitation of a substandard area comprising eighteen city blocks in the borough of Manhattan by the erection of thirty-five apartment houses capable of accommodating about twenty-five thousand people. Under the contract the City of New York agreed to condemn and bring under one good title the entire area. Stuyvesant agreed to acquire the area, demolish the old buildings and construct new ones, all without expense to the city. Metropolitan agreed to advance the necessary funds to Stuyvesant, guaranteed performance by the latter, and, with Stuyvesant, assumed all risks of the venture. The city granted tax exemption for twenty-five years only to the extent of the enhanced value to be created by the project. Stuyvesant agreed to convey to the city bordering strips around the periphery of the project in exchange for land in streets which the city agreed to close.

" The contract regulates rents at rates intended to yield the statutory limited return, prohibits mortgaging and sale of the project, gives the city certain auditing privileges, and requires payment to the city upon the dissolution of Stuyvesant of any earned cash surplus after payment of all indebtedness. Upon the termination in any way of tax exemption, Stuyvesant may dissolve and convey its property to Metropolitan, and the statute and contract become inapplicable to the project."

\* \* \*

" Our decision then must rest on the co-ordinate commands expressed in the equal protection clauses of the Federal and State Constitutions. For many years it has been unquestioned that the great prohibitions of the Fourteenth Amendment are addressed to that action alone which ' may fairly be said to be that of the States ' (*Shelley* v. *Kraemer,* 334 U. S. 1, 13; *Civil Rights Cases,* 109 U. S. 3). Upon that characteristic of the constitutional inhibition these parties have joined issue.

Respondents contend that they are private companies, beyond the reach of the constitutional restraint and free to select arbitrarily the tenants who will occupy Stuyvesant Town. Appellants insist that the avowed discrimination falls under the constitutional ban because they say it has been aided and made possible by the action of the State. The issue is decisive, for the policy of respondents could not be followed by a governmental body (cf. *Buchanan* v. *Warley*, 245 U. S. 60).''

The decision finally differentiated between the rights of Stuyvesant Town Corporation and Metropolitan Life Insurance Company (pp. 533–534) and any restraints in respect of discrimination in selecting tenants, as follows:

'' Appellants here rely upon those cases [*Shelley* v. *Kraemer, supra*; *Marsh* v. *Alabama*, 326 U. S. 501] in urging that we must characterize as governmental action the rental policy of Metropolitan and Stuyvesant. They point to the acknowledged contribution made by government to the project — principally the tax exemption amounting to many millions of dollars, and aggregation of the land through use of the city's power of eminent domain and through exchange of bordering tracts for city streets which had been closed. Moreover, we are urged to consider the size of the project as in reality forming a large community within the city.

'' All of the previous decisions, and others cited, might be distinguished in that they disclose the exertion of governmental power directly to aid in discrimination or other deprivation of right, or the action of a private group in the exercise of a governmental function. Neither factor is present here, where the State has remained silent and has indicated that the public purpose has been fulfilled by the rehabilitation of a substandard area (*Matter of Murray* v. *La Guardia*, 291 N. Y. 320, *supra*). This conclusion is reinforced by the constitutional provision, hereinbefore referred to, which specifically negated any authorization to State or city to engage in any private business or enterprise in connection with the rehabilitation of substandard areas (art. XVIII, § 10).''

Obviously, from the foregoing it is unquestionable that the basis of the decision was that there was a valid, binding and subsisting contract made June 1, 1943, by the parties thereto within the provisions of which were stated the status, rights and obligations of the parties.

Turning to the dissenting opinion, we also find recognition of a valid, binding and subsisting contract (pp. 537–538) in this statement:

" In 1943, Metropolitan caused Stuyvesant to be formed pursuant to the statute. There followed negotiations, between the City on the one side and Stuyvesant and Metropolitan on the other, which culminated in a contract embodying a plan for the rehabilitation of a substandard area comprising eighteen city blocks in Manhattan, running north from East 14th Street to East 20th Street, and running east from First Avenue to the East River Drive or Avenue C. The plan and the proposed contract received the requisite approval from the State Superintendent of Insurance, from the Planning Commission and from the Board of Estimate of the City of New York. Following closely the contours of the Redevelopment Companies Law, the contract called for condemnation by the City of the site and its conveyance to Stuyvesant at cost; for grant by the City to Stuyvesant of all public streets within the project in return for an equivalent area on its periphery; and for tax exemption on improvements for twenty-five years. For its part, Stuyvesant agreed to acquire the area, demolish the old buildings and construct the Stuyvesant project. Metropolitan was to advance the necessary funds and to guarantee performance by Stuyvesant.

" Condemnation of the land and its transfer to Stuyvesant, along with public streets, was accomplished in 1945, and construction of Stuyvesant Town began in that same year. The Town is now virtually completed, at a cost of over $90,000,000. It occupies eighteen city blocks and, with its thirty-five buildings, houses a population of about twenty-five thousand people. Streets in the area are ' private ' and signs at all entrances give the public notice of that fact."

The thesis then stated by the minority opinion was the following (pp. 544–545):

" It is my conclusion, then, that the Fourteenth Amendment proscribes discrimination in Stuyvesant Town. And, since the equal protection clause of the Constitution of New York State (art. I, § 11) is at least as broad in coverage as its Federal counterpart, it is likewise my conclusion that the State Constitution also condemns it.

" It is vehemently urged that to hold that Stuyvesant must discontinue its discriminatory practices would be to deprive respondents of an advantage implicit in their bargain with the City. The flaw in that argument is that the unseen protocol being relied upon was lawless from the start and may not be given effect. The argument overlooks that the constitutional rights of American citizens are involved and that such rights may not

be used as pawns in driving bargains; respondents may not, by making a contract and bargain, succeed in avoiding the restraints imposed by Federal and State Constitutions upon their rights and powers. As Mr. Justice HOLMES observed, ' One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.' (*Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 357.) In brief, the vice of the bargain asserted lies in its very effort to accomplish forbidden discrimination. In point of fact, the argument advanced proves too much. Insofar as respondents rely upon a bargain with the City for discrimination, we have confirmation indisputable that state action was present. If, on the other hand, respondents do not insist that there was such an agreement, they may not complain that they were led by the City to believe that they could practice discrimination.''

The *Dorsey* case involved the issue of discrimination. That issue is not presented or pertinent here, and is not considered. As pointed out, necessary to the consideration and determination was the holding that Stuyvesant Town Corporation and Metropolitan were private corporate entities entitled to the private rights of property and selection of tenants under and, subject only to the obligations imposed by the valid subsisting contract of June 1, 1943.

The purpose of the statute and the contract cannot be disputed in the light of the decisions of the Court of Appeals. They decided that the purpose was rehabilitation and that tenancy in the project is not restricted to '' low-income '' groups, '' middle-income '' groups or any other class of tenancy.

The mandatory obligations of the statute were carried into the contract. In *Pratt* v. *La Guardia* (182 Misc. 462, affd. 268 App. Div. 973, appeal dismissed 294 N. Y. 842) a taxpayer's suit was brought to have the contract declared void on the ground, among others, that it was ''illusory ''. In holding that the contract imposed a binding obligation upon these petitioners which had to be performed within a reasonable time, the court (Mr. Justice SHIENTAG) said: '' The obligation on the part of Stuyvesant and Metropolitan to perform is by no means illusory. There is no escape from it. The plaintiff would have us believe that the comprehensive detailed contract, entered into after long negotiation and close scrutiny by various governmental agencies, was all ' sound and fury, signifying nothing ' so far as the companies who are obligees are concerned. A contract cannot

be interpreted to reach any such absurd result." (182 Misc. 466.)

As the contract was upheld as valid in the *Pratt* case and its validity and subsistence were basic to the determination of private corporate status and rights in the cases of *Matter of Murray* v. *La Guardia* (*supra*) and *Dorsey* v. *Stuyvesant Town Corp.* (*supra*), the conclusion must necessarily follow that the rights and obligations of the city as well as of the city's board of estimate in respect of the contract and its terms are those stated and agreed upon therein. The contention that the contract attempts to divest and would be illegal if it succeeded in divesting the board of estimate of discretion in respect of a rent increase, as that would make the board and its members rubber stamps, is not sound. The discretion was exercised as in every other important instance of consideration of proposed contractual terms and the approval thereof and of instruments embodying same, before, during and upon the occasion of the execution of the city's solemn written agreement. In each such instance where action is taken, and indeed, in the performance of every official act, the board and its members act pursuant to and under authority of law. In the instance of the contract of June 1, 1943, the action was under the provisions of law which are the usual authority but more specifically under the guidance, control, authorization and direction of the Redevelopment Companies Law.

The statute says that " the contract shall regulate rentals ", not the board of estimate. The statute directs that the provisions of the contract shall be consistent with the statute, which itself provides in section 8 that " there shall be paid " a return of 6%, and the city followed the mandate of the statute that " the contract shall regulate the rents " by entering into an agreement with petitioners for the prescribed return of 6%. Finally, the board of estimate approved the contract " as to conformity with the provisions and purposes " of the statute. " The contract regulates rents at rates intended to yield the statutory limited return ". (*Dorsey* v. *Stuyvesant Town Corp., supra,* p. 530.)

The board of estimate has previously acknowledged the right of Metropolitan to a 6% return. The resolution adopted by the board of estimate approving the supplemental agreement increasing the maximum average rental to $17 per room, recites that it was satisfied that " because of the greatly increased cost of construction and operation during the past four years " the increase was required " in order that the limited return provided for in Section 8 of the Redevelopment Companies Law

may be more nearly earned ''. The supplemental agreement itself recites that the increase was necessary `` in order that the limited return provided for in Section 8 of the Enabling Act may be more nearly earned '' and that, while the `` right '' of the corporation to an increase in rent in order to provide the limited return authorized by the statute and the agreement `` is to be preserved,'' nevertheless, petitioners in view of the present increase were willing to agree that no application for any further rental increase to be effective before October 1, 1950, will be made.

Of course, the tenants would prefer no increase in rental. An increase of $7.87 a room will undoubtedly cause hardship to many. Elements involving the high cost of living not directly traceable to rent are also causes. Nevertheless, there is at stake here a principle far greater than even the increased burden put upon the tenants, as appealing as their plights is to sympathy and equity. As Council President Halley has pointed out, a repudiation of the city's contract with Metropolitan `` would seriously affect the city's faith and credit.'' (Meeting of board of estimate, June 12, 1952.) The loss of seven lives in the Brooklyn fire tragedy points to the continuing need for encouragement to private investment capital to build other Stuyvesant Towns, constructed and maintained in a first-class manner, as Comptroller Joseph ably and pointedly remarked. (Board of Estimate meeting, October 11, 1951.)

Various members of the board of estimate, both present and past, have stated that the contract in suit was mutually advantageous to the contracting parties. Comptroller Joseph has said that `` Mr. Ecker and his associates, in my opinion made a very fine contract for the Metropolitan and the City of New York.'' (Meeting of board of estimate, June 12, 1947.) Borough President Lyons recalled that when the contract was entered into Metropolitan was the only company which showed any indication of co-operating with the city; `` and if it were not for the vision and action of the Board (of Estimate) at that time in entering into this agreement, there would be no homes for those 9,000 tenants living in Stuyvesant Town today.'' (Board of Estimate meeting, May 19, 1952.)

At the hearing before the board of estimate on June 3, 1943, Commissioner Moses, in reviewing the negotiations which preceded the contract said: ``I want to emphasize here that the Metropolitan went into this proposition at the instance of the City of New York and also State officials. They were asked to do this as a matter of public service. They didn't come around

saying they were thirsty to get into this kind of thing. * * *
I want to emphasize here, and to particularly emphasize, it has
been said by various people including public officials who ought
to know better that this is a public enterprise because of the
gifts of the City. There are no gifts of the City. The City is
merely providing the minimum of inducements to get the only
big company interested in this kind of thing to go into it. The
City is going to collect in taxes substantially more than it is
collecting today on the basis of present assessments, including
assessments of old buildings, rotten buildings that are going to
be torn down by the company. It is a good piece of business for
the City of New York. The City eventually is going to collect
on the basis of the assessment not only of the land but of the
improvement to [at] the end of the period of 25 years, when,
as I said before, this company will still have one-third of its
investment to amortize.''

The respondent members of the board of estimate, when they
voted against a rent increase, acted in what they believed to be
the best interests of the tenants of Stuyvesant Town, for the
reason that in their opinion such increase would cause severe
hardship. The interest they had in the tenants in Stuyvesant
Town and in tenants generally, who are a considerable part of
the citizenry of the city, led the members of the board to action
which they regarded as courageous and independent and in
accordance with the spirit of the emergency rent control laws
and the democratic principle of the greatest good for the
greatest number. In government itself there are checks and
balances by which each branch effectuates, moderates or cor-
rects the action of either of the other two. Theoretically at
least and generally of practical application, there are other
democratic principles which have similar purpose and tendency
for the protection and preservation of human, property and
contractual rights both inalienable or embodied in Constitution
or in sound statutes. Adhered to such principles are guides
and bulwarks against surrender to temporary popular demand,
the sway of sympathetic appeal, the siren demand of the dema-
gogue, or the vociferously vocal misleading assertions of a
rabble-rousing minority. Although it may not be directly appli-
cable, with profit it may be observed that permitting '' Panmun-
jonian '' discussion of accepted facts or settled truism cannot
aid in the democratic process of consideration and decision of
solvable problems. The desire of leaders in business, industry,
civic and social life to maintain stability and prevent inflationary
rises in the cost of housing, food, clothing and other necessities

is even stronger and more understanding among those who are placed in positions of public responsibility directly by the people. The members of the board are entitled to praise. They may not be subjected to any censure for doing what they conceived to be just and equitable and their obligation under the circumstances presented.

The petitioners, on the other hand, have not been shown to be indifferent to the condition of their tenants. Petitioners are not free agents. They have obligations to their policyholders, stated to number 33,000,000 (*Dorsey* v. *Stuyvesant, supra,* p. 521), to secure a fair return upon the huge sum invested, which otherwise would be in the nature of a speculative venture. Many tenants of Stuyvesant Town have been in occupancy for almost five years. During that period their rent has not been increased, due to a liberal concession made by petitioners to the board of estimate in the interest of the tenants. In the meantime, prices, incomes and wages were increasing generally, and the cost of operating Stuyvesant Town has risen year by year. The tenants in Stuyvesant Town are paying an average of $17 per month per room. But the city is renting low-rent housing for persons of low income for $16.59 per room (Project Statistics, April, 1952, New York City Housing Authority, pp. 9–10), and this month entered into contracts for middle-income subsidized housing for 11,640 units to be rented at $30.50 per room per month (Report of the Committee on Slum Clearance Plans, pp. 2, 20, 51). The petitioners, nevertheless, in January of this year have written to each of their 9,000 tenants in Stuyvesant Town as follows:

" While legal considerations have made it necessary that this ceiling rental be fixed, we have at this time no intention of asking you to pay an average increase of that amount. Instead, we now plan, when the pending application is acted upon, to increase the rental for your apartment for the next rental term by a lesser amount, which we believe you will find to be reasonable.

" You have our assurance that we shall continue to do our best to give you the comforts and conveniences which have made Stuyvesant Town a landmark in our nation's progress towards better living at moderate cost."

The term " reasonable " is not subject to exactness of, definition. It may be said to mean fitting and proper and characterized by moderation. It is a factual expression not ascertainable by reference to rule, law or formula. It is certainly questionable whether the 6% formula of the contract would be fair or reason-

able to present tenants. They are now paying on the basis of $17 per room on the average under a supplemental agreement of modification of that contract. While the supplementary agreement contemplated an application for increase effective on October 1, 1950, the present tenants undoubtedly felt that any such increase in respect of them would be moderated by reasonableness and even alleviated somewhat by a spirit of friendly co-operation. The term reasonable may be and undoubtedly is subject to construction in the light of facts, circumstances and experience. Petitioners seem to have indicated what they then regarded as reasonable at the time when they presented and were arguing for their application to the board of estimate. There they indicated through counsel, as stated by him before the board of estimate at the board's meeting of May 19, 1952, the following: '' We had felt inclined to depart from our rights; we agreed then, and I repeat, we would agree today to keep the rent increases to present tenants to $2.55 a year for three years and to $3.00 for the fourth year for present tenants on an average.''

We feel required to summarize and state our conclusions.

Guided and controlled by the above decisions and, in any event, under the requirements of this present litigation and the evidence before us, we here find and decide that the contract entered into on the 1st day of June, 1943, by the City of New York with Stuyvesant Town Corporation and Metropolitan Life Insurance Company is the valid, binding and subsistent agreement of the parties.

We hold that the terms of the contract are also valid, binding and subsisting and in particular that the provision embodying the 6% return upon the investment by petitioners in the project is binding upon the parties to the contract. That provision is number 304 of the contract and it has the direct authorization, approval and mandate of section 8 of the Redevelopment Companies Law (L. 1943, ch. 234).

The investment of petitioners is the sum of $112,210,057.64 which has been audited and found correct by the comptroller and accepted as correct without any indication of disapproval by the board of estimate. The tenants had the opportunity of working co-operatively with the comptroller during the official audit and in fact there were numerous conferences of the representatives of the comptroller while so engaged in making such audit with representatives of the tenants. There is no evidence offered or called to the court's attention which shows any reason

for disagreement with or for not accepting the items and the result stated in the comptroller's audit.

Under the statute and contract petitioners are entitled to a return of 6% on the investment of $112,210,057.64.

Equitable consideration of the interest and plight of the tenants which motivated the members of the board of estimate in denying the application presented by petitioners did not justify or warrant such denial. Such equitable consideration nevertheless did warrant the efforts made by members of the board of estimate to ameliorate the hardship and plight of the tenants in seeking fair adjustment by arriving at a reasonable compromise of the increase in respect of the present tenants.

The question of reasonable amount, particularly in view of the offer made by counsel for petitioners alluded to above, has not been directly raised before the court. However, the direction sought is that the board of estimate take the action which the facts presented required to be taken as matter of law under the contract and statute. The correct and proper action by the board of estimate on the application presented required the grant to petitioners of the increase of the maximum average rental per month per room to an amount sufficient to provide the six per centum return on the investment in accordance with the contract and statute.

Repeating, however, from the offer by petitioners' counsel quoted above, we find and decide that petitioners agreed when their application was presented and in final statement at the meeting of the board of estimate just prior to the board's action '' to keep the rent increases to present tenants at $2.55 a year for three years and to $3.00 for the fourth year for the present tenants on an average.''

It is clear that had the board of estimate thereupon taken the action required as matter of law, conserving as best it could under the circumstances the interests of the tenants, it would have granted the petitioners' application with the saving modification agreed to by petitioners in respect of present tenants.

It should be observed that the purpose of article 78 (§§ 1283 *et seq.*) of the Civil Practice Act (proceeding against a body or officer) was to wipe out technical distinctions which had been a snare for suitors approaching the court for relief and which at times hampered the court in granting relief for proven grievances (*Matter of Newbrand* v. *City of Yonkers,* 285 N. Y. 164). While an order to compel performance of an alleged official duty may be granted only if the applicant establish a clear legal

right thereto, under the proof the court may still determine whether, in the exercise of a sound discretion, it will grant or withhold the order or direct modified relief. Abuse of discretion is the only ground as matter of law for reversal of such an order (*Matter of Pruzan* v. *Valentine*, 282 N. Y. 498).

Application granted to the extent indicated. Settle final order.