Samuel H. Hofstadter, J.
This is a case of first impression. In effect, the gravamen of the complaint is that the contract by virtue of which the plaintiffs would become proprietary tenants of apartment 4-S of 1001 Park Avenue was frustrated by the defendants because the plaintiffs are members of the Jewish faith.
Defendants, other than defendants Hirst and Smith, move under rule 3211 (subd. [a], pars. 1, 2, 7) of the Civil Practice Law and Rules to dismiss the complaint.
The complaint sounds in prima facie tort. Since this court has jurisdiction of such causes of action, the motion under rule 3211 (subd. [a], par. 2) (that the court has no jurisdiction of the subject matter of the cause of action) must be denied.
Nor is the documentary proof (rule 3211, subd. [a], par. 1) determinative of the motions. The amended complaint superseded the original complaint; and the provisions of title X of chapter 41 of the New York City Administrative Code, the application made by plaintiffs to the Commission on Human Rights and the finding of the commission against defendants, 1001 Tenants Corporation and Johnson (see City of New York v. 1001 Tenants Corp., 41 Misc 2d 518) all go to the sufficiency of the amended complaint.
The amended complaint must be liberally construed (CPLR 3026; Dulberg v. Mock, 1 N Y 2d 54). Whether plaintiffs will be able to establish its allegations on the trial (in their answer defendant 1001 Tenants Corporation and three of the individual defendants deny material allegations of the amended complaint) *514 is, in Chief Judge Desmond’s words, “ besides the point at this pleading stage ” (Dulberg v. Mock, supra, p. 57).
According to the complaint: Plaintiff, Alfred R. Bachrach is a senior partner of a well-known firm of certified public accountants. He is also president of Congregation Emanu-El of this city, a director of several charitable and public service corporations and of a hospital. He is a member of three clubs, on the board of governors of a college and is a former vice-president of the National Board of Girl Scouts.
In April of 1960, he entered into a contract to buy 510 shares •of the stock of defendant 1001 Tenants Corporation, a co-operative holding title to 1001 Park Avenue. The same agreement covered the proprietary lease to Apartment 4-S of the building. The lease and the by-laws of the co-operative required the consent of its board of directors to the sale and assignment. Toward this end, the seller, the estate of Lucile Chapman Dunscomb, forwarded the signed agreement promptly to defendants Ash-forth and Wagner, and plaintiff Alfred Bachrach forwarded to them his social, business and credit references.
Ashforth was managing agent of the building and Wagner was its vice-president. These defendants, in turn, submitted the agreement to 1001 Tenants Corporation and gave notice of the transfer to the remaining individual defendants, its directors — also sending to them copies of plaintiff’s references.
In late May, the board of directors not yet having acted, plaintiff Alfred Bachrach sought to meet with the board, but was refused an appointment. In July, the board finally met and the matter was discussed. All of its members knew that he was Jewish. The application for its consent was thereupon rejected through the device of having no director move its approval.
It is further alleged that: Plaintiffs are husband and wife. The defendants’ sole motive was religious discrimination contrary to public policy, founded in malice and without cause and intended to injure the plaintiffs. Defendants Ashforth and Wagner are alleged to have acted in concert with the board of directors with such motivation and intent. On no previous occasion had defendants delayed action for more than two months or rejected a similar application. .As a result of defendants’ acts, plaintiffs had to buy another apartment at higher costs and suffered other damage, for which they now sue, claiming $70,000 in monetary damage and $250,000 as punitive damages.
This complaint is novel but on that account I am not justified in holding it insufficient. In such case I am warranted in antici *515 pating the ruling of the appellate courts (Deveny v. Rheem Mfg. Co., 319 F. 2d 124).
The clear current of decision is not to deprive a claimant of damages arising from the intentional infliction of temporal damage (Opera on Tour v. Weber, 285 N. Y. 348; American Guild of Musical Artists v. Petrillo, 286 N. Y. 226; Advance Music Corp. v. American Tobacco Co., 296 N. Y. 79). “ The key to the prima facie tort is the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or a series of acts which would otherwise be lawful ” (Ruza v. Ruza, 286 App. Div. 767, 769).
Though the 1001 Tenants Corporation could, in law, refuse its consent to plaintiff Alfred Bachrach’s purchase of its stock and the proprietary lease if it had no ulterior or illegal objective (Weisner v. 791 Park Ave. Corp., 6 N Y 2d 426; Penthouse Props. v. 1158 5th Ave., 256 App. Div. 685), the defendants can be cast in damages if they procured such refusal for illegal or ulterior reasons or purposes.
We do not need to reach here the question of whether the Fourteenth Amendment condemns such purposes. Nor need we even consider the effect of section 11 of article I of the State Constitution, except as it underlies section Bl-1.0 and title X of chapter 41 of the New York City Administrative Code (cf. Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512; see Matter of Martin v. Commission on Inter group Relations, 16 Misc 2d 235). For, it is eminently clear that with the enactment of our local laws, defendants’ action was contrary not alone to the public policy but also to the explicit law of this State and city.
Section Bl-1.0 of the code reads in part: “ In the city of New York, with its great cosmopolitan population consisting of large numbers of people of every race, color, creed, national origin and ancestry, there is no greater danger to the health, morals, safety and welfare of the city, and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of difference of race, color, creed, national origin or ancestry.” Section X41-1.0 of the code, with an exception not relevant here, prohibits an ‘ ‘ owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease, a housing accommodation which is located in a multiple dwelling ’ ’ from denying these accommodations to any person because of his “ race, color, religion, national origin or ancestry ”; and directs that he may not discriminate against or segregate any person on these grounds.
*516 If anti-Semitism has been a sad, recurrent theme in history, it is to the glory of America that its people were not infected with its more virulent forms. In America, the history of conscience has never been separated from our political history of independence, freedom and equality. As part of our Puritan heritage, rooted in Scripture, we have always sought moral reference for our intent and action. Ancient bigotries were rendered sterile by our cultural pluralism and the climate of individual human dignity engendered by the Constitution. In America the blood of all her sons have mingled freely on all the battlefields of the Republic and her heroes — of every race, creed and color — lie in the hallowed ground of her national resting places everywhere. For anti-Semitism in its modern forms is not indigenous to American soil — as it never was to Britain, Ireland or the Scottish isles. It was an importation from the continent of Europe; and it was reanimated and given political reactivation in our lifetime as an instrument of policy by “ Brown ” and “ Red ” authoritarianism alike.
It was inevitable, perhaps, that in the “ complicated conglomerate out of which evolved the distinctive American civilization ” —in Justice Frankfurter’s recent reformulation — the body politic of our pluralistic society might on occasion tend to contamination by alien infection. But Americans of all faiths have ever been alert to recognize the disease for what it was — the most potent anti-democratic weapon in the arsenal of radical reaction. To the degree that equality is impaired, to that extent is freedom weakened. Democracy and freedom from discrimination are bound together.
The dismal story of man’s inhumanity to man will only be brought to a final close when race, creed, color and ancestry are no longer bars to economic opportunity and education, public accommodation and housing! ‘ ‘ Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.” (Hirabayashi v. United States, 320 U. S. 81, 100.) When these bars have really been demolished, then our citizens will live in common dignity, serenity — and at peace. This is the ethical aspiration proclaimed by our Judaeo-Christian dispensation and politically enshrined in our Constitutions, Federal and State.
It is heartening to note that, as Mr. A. M. Sonnabend, president of the American Jewish Committee, pioneer human relations agency, recently reported, our Nation “ has made substantial and significant civil rights advances this year ’ ’ notwithstanding that “not all Americans have been on the *517 right side and he concludes that “ historical perspective on 1963 could see this period as the turning point of the second American Revolution — a constructive revolution to realize in full for all of our people the freedoms which are our heritage. ’ ’
The plaintiffs’ complaint is that the defendants indeed have frustrated this expectation by willfully denying consent to plaintiffs’ purchase of an apartment solely because of inadmissibly discriminatory reasons. If this be true — which is a matter for proof on a trial and not for adjudication on a pleading — their objectives are unlawful and their action wrongful — and, therefore, actionable.
Whatever the rule of the past, with the proscription of discrimination in housing in this city by its local laws, action so motivated is no longer immune from judicial remedy.
The complaint is sufficient unless title X effects a pre-emption — i.e., provides an exclusive remedy. I must reject the defendants’ contention in that behalf. The State statute (Executive Law, art. 15, §§ 290-300) was first enacted in 1945. (This year California became the eleventh State to bar discrimination in private housing; and Connecticut and Massachusetts strengthened their existing statutes). Section 300 expressly provided that the procedures outlined “ shall, while pending, be exclusive ”. Title X was added to the New York City Administrative Code in 1957. Unlike the provisions of the Executive Law, it does not render procedures before the commission necessarily exclusive, since no limitation similar to that in the State law was included in title X. Traditional construction of legislative enactments commands the conclusion that such omission was intentional and a limitation may not therefore be implied. This conclusion is reinforced by the compelling imponderable that between 1945 and 1957 there was an expansion as well as an acceleration of antidiscrimination efforts. Public policy in this direction has continued to date as is evidenced by the recent report of the New York County Lawyers Association Civil Rights Committee which called for “ a shift in emphasis from persuasion and conciliation to vigorous law enforcement.” Title X, hence, may not be given a restrictive construction. Certainly no such connotation should be implied. It is part of the advance in governmental philosophy which includes an enlargement of remedy, not a limitation. (See Matter of Holland v. Edwards, 307 N. Y. 38; Chotapeg, Inc. v. Bullova, 291 N. Y. 70; and, also, Ruiz v. Bertolotti, 37 Misc 2d 1067, affd. 20 App. Div. 628.)
Motions denied.